Robert E. BULTEMEYER,
Plaintiff–Appellant,

v.

FORT WAYNE COMMUNITY
SCHOOLS, Defendant–
Appellee.

No. 96–1984.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 24, 1996.

Decided Nov. 18, 1996.

Christopher C. Myers (argued), Samuel L. Bolinger, Myers & Geisleman, Fort Wayne, IN, for Plaintiff-Appellant,

William Sweet (argued), Kristen L. Maly, Beckman Lawson, Sandler, Snyder & Federoff, Fort Wayne, IN, for Defendant-Appellee.

Before POSNER, Chief Judge, and WOOD, Jr. and ESCHBACH, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge.

Robert Bultemeyer filed this claim under the Americans with Disabilities Act of 1990 (ADA) against the Fort Wayne Community Schools, his former employer, for allegedly failing to accommodate his mental illness and for terminating his employment. The district court, Magistrate Robert Cosbey presiding, granted summary judgment for the defendant. Bultemeyer appealed, and we reverse.

## FACTS

Robert Bultemeyer began working for the Fort Wayne Community Schools ("FWCS") in 1978, and was employed as a custodian until 1993. During that period, he developed serious mental illnesses, including bipolar

disorder, anxiety attacks and paranoid schizophrenia. Bultemeyer went on a series of disability leaves; the last one extended from May, 1993 until April, 1994. In April, 1994, he began working for the Fort Wayne Park and Recreations Department. On May 16, 1994, FWCS' employee relations director, Brenda Singleton, contacted Bultemeyer to see if he were ready to return to work at FWCS. He responded that he was, and she told him of an open position at Northrop High School, one of the largest of the thirty or more schools operated by FWCS. She told him that in order to begin working again, he would have to take a physical required of all employees returning from disability leave. She then informed him that he would not receive any special accommodations at Northrop, as he had at the other FWCS schools where he had worked. She was referring to his employment at North Side High School, where, at his psychiatrist's request, his duties had been limited to cleaning hallways, stairwells, locker rooms and the like, and not classrooms. In a letter dated May 17, 1994, Singleton instructed Bultemeyer that he was to report to work at Northrop at 3:30 p.m., and that if he did not, his employment would be terminated.

That same day, Bultemeyer toured Northrop High School with Steve Mock, the custodial foreman. During their walk, Mock commented to Bultemeyer that if he (Bultemeyer) moved as slowly while he worked as he was walking then, he would never get his work done on time. Bultemeyer then went to Singleton and told her that he could not work at Northrop. He said he did not think he was equal to the task, but he also told her that he was not resigning. Bultemeyer was also afraid to take the physical, because he thought that if he passed, he would have to work at Northrop, and if he worked there, he would be unable to perform his tasks and would get fired. So Bultemeyer did not take the physical, and he did not report for work on May 17.

On May 20, Bultemeyer went to Dr. Fawver, his psychiatrist, and obtained a letter to FWCS saying "due to Bob's illness and his past inability to return to work, it would be in his best interest to return to a school that might be less stressful than Northrop High School." On May 24, Singleton decided to fire Bultemeyer and sent him a letter notifying him that his employment with FWCS was terminated because he had not reported for work and had not taken the physical. A few hours later, Bultemeyer delivered the note from Dr. Fawver. He received no response from Singleton, but someone from FWCS contacted him about rescheduling his physical. When he called FWCS on May 26 to reschedule, he received no response.

Bultemeyer filed suit against FWCS, alleging that FWCS had violated the ADA by failing to make reasonable accommodations for his mental disability. He alleged that although FWCS knew of his illness and had been given a note from Dr. Fawver requesting a less stressful position, it did nothing to accommodate him. FWCS moved for summary judgment.

Following our holding in *DeLuca v. Winer Industries*, 53 F.3d 793 (7th Cir.1995), the trial court applied the *McDonnell–Douglas* four-part burden-shifting test for disparate treatment to Bultemeyer's ADA claim. The court then held that Bultemeyer had not stated the elements of a prima facie case under that test. The court also found that Bultemeyer had not asked for reasonable accommodation, and held that even if Dr. Fawver's letter could be considered a request for accommodation, it was not delivered in time, because he had already been fired. In addition, the court notes, as FWCS does here, that Bultemeyer presented no evidence that any other custodial position in the FWCS district was less stressful than the job at Northrop. The court thus concluded that Bultemeyer could not prove he was qualified for reassignment.

Because this case should have been decided as a reasonable accommodation case and not as a disparate treatment case, and because Bultemeyer has presented genuine issues as to whether FWCS reasonably accommodated his disability, we reverse the trial court's grant of summary judgment.

## DISCUSSION

We review the district court's decision to grant summary judgment de novo, and only

if genuine issues of material fact are evident in the record will we reverse. We examine all evidence and draw all inferences in the light most favorable to the non-moving party. *Tolentino v. Friedman*, 46 F.3d 645, 649 (7th Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 2613, 132 L.Ed.2d 856 (1995). Because this is an employment case, highly dependent on issues of intent and the credibility of witnesses, we must apply these standards with "added rigor." *Sarsha v. Sears, Roebuck & Co.*, 3 F.3d 1035, 1038 (7th Cir.1993); *Robinson v. PPG Indus., Inc.*, 23 F.3d 1159, 1162 (7th Cir.1994). Thus, "we will affirm the decision of the district court only if, had the record before that court been the record of a complete trial, the defendant would have been entitled to a directed verdict." *Robinson*, 23 F.3d at 1162. If there is evidence in the record on which a jury could reasonably find for the non-moving party, we will reverse. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

## I.

▮ The trial court mistakenly relied on our holding in *DeLuca v. Winer Industries* when it analyzed Bultemeyer's claim as a disparate treatment case and applied the *McDonnell–Douglas* burden-shifting test. In *DeLuca*, the plaintiff, who had multiple sclerosis, sued his employer for firing him because of his disability. He claimed that other employees who were not disabled were treated more favorably. Central to DeLuca's claim was the portion of the ADA prohibiting discrimination against "a qualified individual with a disability because of the disability ..." 42 U.S.C. § 12112. This was a claim for disparate treatment, and because DeLuca had no direct proof of discrimination, he used the *McDonnell–Douglas* burden-shifting method to prove indirectly that his employer had fired him because he had multiple sclerosis. This court, although it affirmed the trial court's grant of summary judgment against *DeLuca*, approved the use of the *McDonnell–Douglas* burden-shifting method of proof in ADA cases. It explained that an ADA plaintiff could state a disparate treatment claim and use either direct evidence or the indirect *McDonnell–Douglas* method to

establish the existence of discrimination. *DeLuca*, 53 F.3d at 797.

By contrast, Bultemeyer has not stated a claim for disparate treatment. He has based his complaint on the specific provision of the ADA which defines "discrimination" under the ADA. That provision defines the term "discriminate" as:

(5)(A) not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of [the employer]; or

(B) denying employment opportunities to a job applicant or employee who is an otherwise qualified individual with a disability, if such denial is based on the need of [the employer] to make a reasonable accommodation to the physical or mental impairments of the employee or applicant.

42 U.S.C. § 12112(b)(5)(A)–(B). Bultemeyer claims that he was a qualified individual with a disability, and that FWCS did not reasonably accommodate him. Unlike DeLuca's claim, Bultemeyer's claim alleges facts which, if proven, could directly establish a violation of the ADA. If it is true that FWCS should have reasonably accommodated Bultemeyer's disability and did not, FWCS has discriminated against him. There is no need for indirect proof or burden shifting. Recently, we have decided several reasonable accommodation cases in this circuit, all without using the *McDonnell–Douglas* analysis. E.g., *Beck v. University of Wisconsin Bd. of Regents*, 75 F.3d 1130 (7th Cir.1996); *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560 (7th Cir.1996).

Again, like *Beck* and *Bombard*, this is not a disparate treatment claim, but a reasonable accommodation claim, and it must be analyzed differently. Bultemeyer is not complaining that FWCS treated him differently and less favorably than other, non-disabled employees. He is not comparing his treatment to that of any other FWCS employee. His complaint relates solely to FWCS' failure to reasonably accommodate his disability.

Because this is not a disparate treatment case, the *McDonnell–Douglas* burden-shifting method of proof is unnecessary and inappropriate here. We will thus examine the record of this case to see if Bultemeyer has raised genuine issues of material fact under a reasonable accommodation analysis.

## II.

First, an understanding of mental illness is central to understanding Bultemeyer's request for accommodation and his complaint. He was unable to articulate to Singleton that he wanted FWCS to accommodate his disability, but through Dr. Fawver he did communicate that he wanted a position that was "less stressful." If the precise meaning of this letter was unclear, FWCS could have spoken with either Bultemeyer or Dr. Fawver. Had it done this, it would have been properly engaging in the interactive process. Instead, FWCS unilaterally determined that Bultemeyer was wrong in thinking that the position at Northrop was more stressful than any other position. But neither we nor FWCS may fully comprehend Bultemeyer's reasons for finding Northrop High School stressful. It may be true that, objectively, Northrop is no more difficult a work environment than any of the other schools in the FWCS district. But "stress" is not something that can be measured objectively; it is subjective, and what is stressful to one may be completely non-stressful to another. More factors than the size or age of the school or the size of its student body are relevant. This is especially so when a person is mentally ill. Thus, we view FWCS' argument that, in its view, Northrop is no more stressful than any other school as disingenuous. FWCS cannot measure what goes on in Mr. Bultemeyer's mind, and it cannot know what is stressful to him. And its determination of what is "stressful" certainly cannot be used against Bultemeyer in a motion for summary judgment.

Turning to the statutory provisions of the ADA, then, we examine the facts in the light most favorable to Bultemeyer to see if he has presented a genuine issue of material fact that FWCS failed to reasonably accommo-date him. First, Bultemeyer must show that he was or is disabled. His past and continuing battle with bipolar disorder and paranoid schizophrenia is not disputed, and the ADA specifically includes mental illness as a disability. 42 U.S.C. § 12102(2). Next, FWCS must have been aware of Bultemeyer's disability. *Beck v. University of Wisconsin Bd. of Regents,* 75 F.3d 1130, 1134–35 (7th Cir. 1996). This, too, is undisputed. In fact, FWCS accommodated Bultemeyer in the past when it complied with his psychiatrist's request that he not clean classrooms at North Side High School. FWCS was also aware of his mental illness at the time of this incident, as Bultemeyer was returning from a long period of disability leave, prompted by his illness.

We come now to the main dispute between Bultemeyer and FWCS: whether Bultemeyer was an "otherwise qualified individual" for the job of custodian. Because the ADA prohibits discrimination against only "qualified individual[s] with a disability," Bultemeyer has the burden of proof on this issue, and must show that he is a "qualified individual." *Bombard,* 92 F.3d at 563. This involves a two-step inquiry. First, Bultemeyer must demonstrate that he satisfies the prerequisites for the position, i.e. that he has the proper training, skills and experience. Second, he must show that he could perform the essential functions of a custodian's job, either with or without reasonable accommodation. 29 C.F.R. app. § 1630.2(m), *Bombard,* 92 F.3d at 563.

The parties do not dispute that Bultemeyer satisfies the prerequisites for the position; indeed, FWCS, having employed Bultemeyer as a custodian for many years, cannot dispute that. FWCS does, however, argue strenuously that Bultemeyer was not a "qualified individual," because he could not perform the essential functions of the job, namely, reporting for work and taking the return-to-work physical. FWCS is correct in that Bultemeyer was unable to do this without reasonable accommodation. But under the ADA, a "qualified individual with a disability" is one who, *"with or without* reasonable accommodation, can perform the essential functions of the employment position that such individual

holds or desires." 42 U.S.C. § 12111(8) (emphasis added). Bultemeyer may have been qualified, because he may have been able to perform the essential functions of the job *with reasonable accommodation.* FWCS simply did not give him a chance to demonstrate this. In other words, had FWCS accommodated Bultemeyer by finding him another position or by simply sitting down with him and talking about the situation, he may have been willing and able to take the physical and report for work. When Bultemeyer worked at North Side High School, a simple adjustment in his duties was enough of an accommodation to enable him to work there. But this time, we do not know what might have happened, because FWCS was unwilling to engage in the interactive process and accommodate him. We hold that Bultemeyer has alleged facts which, viewed in the light most favorable to him, present a genuine issue of material fact as to whether he could have performed the essential functions of the job had FWCS accommodated him. He is entitled to the chance to prove it at trial.

### III.

■ An employee's request for reasonable accommodation requires a great deal of communication between the employee and employer. We recognized this in *Beck,* where we held that both parties bear responsibility for determining what accommodation is necessary. *Beck,* 75 F.3d at 1135. We further explained that

No hard and fast rule will suffice, because neither party should be able to cause a breakdown in the process for the purpose of either avoiding or inflicting liability. Rather, courts should look for signs of failure to participate in good faith or failure by one of the parties to help the other party determine what specific accommodations are necessary. A party that obstructs or delays the interactive process is not acting in good faith. A party that fails to communicate, by way of initiation or response, may also be acting in bad faith. In essence, courts should attempt to isolate the cause of the breakdown and then assign responsibility.

*Beck,* 75 F.3d at 1135.

In a case involving an employee with mental illness, the communication process becomes more difficult. It is crucial that the employer be aware of the difficulties, and "help the other party determine what specific accommodations are necessary." *Id.* We think that Bultemeyer has also presented genuine issues of material fact showing that FWCS failed to engage in the interactive process prescribed by this court in *Beck.*

FWCS blames Bultemeyer for the breakdown in the interactive process because he did not specifically request a reasonable accommodation. Bultemeyer may have thought it was futile to ask, after Ms. Singleton told him that he would not receive any more special treatment. FWCS suggests that Bultemeyer should have asked for an accommodation when he first informed FWCS that he was ready to return to work. But it is evident from the record that it was not until after he visited Northrop High School that he decided working there would be too stressful. Neither he nor Dr. Fawver knew ahead of time that this would be the case. When he discovered that working at Northrop was stressful, he asked for an accommodation the way he had done it before: he asked Dr. Fawver to write a letter to FWCS. This is exactly what had worked for him when he was employed at North Side High School, and it was the best he could do. If the note was too ambiguous and FWCS did not know what Bultemeyer wanted, FWCS easily could have called Dr. Fawver for a clarification.

Bultemeyer may not have known that FWCS expected him to ask specifically for a "reasonable accommodation." But properly participating in the interactive process means that an employer cannot expect an employee to read its mind and know that he or she must specifically say "I want a reasonable accommodation," particularly when the employee has a mental illness. The employer has to meet the employee half-way, and if it appears that the employee may need an accommodation but doesn't know how to ask for it, the employer should do what it can to help. "[T]he employer must make a reasonable effort to determine the appropriate accommodation. The appropriate reasonable accommodation is best determined through a

flexible, interactive process that involves both the employer and the [employee] with a disability." 29 C.F.R. pt. 1630, app.; *Beck,* 75 F.3d at 1135.

FWCS maintains that Bultemeyer never asked for a reasonable accommodation and that the letter from Dr. Fawver was an instance of "too little, too late." The trial court also saw the situation this way, going so far as to suggest that Bultemeyer asked Dr. Fawver to "make up" the recommendation for a less stressful work environment, in an attempt to justify his failure to report for work. In this way, the trial court is examining the facts in the light *least* favorable to Bultemeyer, the non-moving party, where instead it should be viewing them in the light *most* favorable to him. *Tolentino,* 46 F.3d at 649. The court and FWCS are also forgetting that Bultemeyer is mentally ill. He suffers from paranoid schizophrenia and bipolar disorder, among other things, yet the district court and FWCS treat him as though he were suffering from a minor physical limitation and being stubborn. Bearing in mind the seriousness of his mental illness, it is evident that Bultemeyer's actions were a product not of a cold, calculating intellect, but of an irrational fear. Bultemeyer was irrationally afraid of Northrop High School: he did not report for work because he was afraid to work at Northrop, and he did not take his physical because he was afraid he would pass and have to work at Northrop. These were not the deliberate actions of a mentally sound man who just didn't want to go to work, they were the product of mental illness. We understand that the irrationality of these fears may be frustrating to FWCS, but as Bultemeyer's employer, FWCS had a duty to engage in the interactive process and find a reasonable way for him to work despite his fears. But FWCS made no inquiry about what Bultemeyer found stressful at Northrop.

FWCS claims that the note from Dr. Fawver came too late for it to respond, because FWCS did not receive the note until after it had fired Bultemeyer. However, FWCS received the note the very same day (not two days later as the trial court mistakenly found). A few hours' tardiness should not be the reason for cutting off the interactive process and cutting off a person's rights under the ADA. This was not a lengthy, inexcusable delay. Bultemeyer delivered the note in an attempt to explain to FWCS what he needed. Even though the letter came after FWCS decided to fire him, FWCS could have used the opportunity it presented to reconsider the decision to terminate his employment and include Bultemeyer and Dr. Fawver in the discussions. That would have been a proper way to engage in the interactive process. Instead, FWCS "fail[ed] to communicate, by way of initiation or response," *Beck,* 75 F.3d at 1135, and the interactive process broke down. It appears FWCS tried to take hasty advantage of what it saw as an opportunity to rid itself of a problem, a disabled employee.

Another example of the breakdown in the interactive process is FWCS' failure simply to inquire of Bultemeyer or his psychiatrist about what he needed to be able to work. This whole incident may not have happened if someone at FWCS had merely had the patience to sit down with Bultemeyer and ask him what the problem was. While requesting a reasonable accommodation is the employee's responsibility, FWCS cannot place the whole burden of the interactive process on the shoulders of Bultemeyer, who is admittedly suffering from mental problems. It had some responsibility, especially considering that it was well aware of Bultemeyer's condition, to take the small step of inquiring of Bultemeyer why he was so reluctant to take the physical and work at Northrop. As the federal regulations implementing the ADA state, "[t]o determine the appropriate reasonable accommodation it may be necessary for the [employer] to initiate an informal, interactive process with the qualified individual with a disability in need of the accommodation." 29 C.F.R. § 1630.2(*o*)(3) (1995); *Beck,* 75 F.3d 1130, 1135. It is clear, then, that the burden was on both FWCS and Bultemeyer to engage in the interactive process.

But, viewing the facts in the light most favorable to Bultemeyer, it appears that FWCS stopped short of its responsibilities. Singleton did not ask Bultemeyer why he

had trouble working at Northrop, although it appears she had the opportunity to do so. Bultemeyer may simply have been afraid to work with Mr. Mock, after hearing his comment about walking too slowly. If Singleton had merely invited Bultemeyer into her office and asked him why Northrop was too stressful, they may have been able to solve the problem. Since she knew he was mentally ill, it seems eminently reasonable that she would ask him to explain his fears, or call his doctor. But it appears to us that FWCS was tired of having to accommodate Mr. Bultemeyer's disability, and when it had the opportunity, it got rid of him. FWCS fired Bultemeyer as soon as it could, and when he presented a request for reasonable accommodation, FWCS ignored it, saying that it came too late. This is, again, an example of a party to the interactive process acting in bad faith.

## IV.

Had the trial court examined these facts in the light most favorable to Mr. Bultemeyer, as we do here, it would not have granted FWCS' motion for summary judgment. After properly analyzing this case under *Beck*, therefore, we hold that Mr. Bultemeyer has presented sufficient evidence to create genuine issues of material fact and to defeat FWCS' motion for summary judgment, although we intend to express no views about the ultimate merits of this case. For these reasons, the grant of summary judgment in FWCS' favor is REVERSED, and the case is remanded for further proceedings.