Katherine R. CEHRS, Plaintiff–Appellant,

v.

NORTHEAST OHIO ALZHEIMER'S RESEARCH CENTER and Windsor House, Inc., Defendants–Appellees.

No. 97–3388.

United States Court of Appeals, Sixth Circuit.

Argued April 21, 1998.

Decided Sept. 1, 1998.

Rehearing and Suggestion for Rehearing En Banc Denied Oct. 16, 1998.

Ellen S. Simon (briefed), Cathleen M. Bolek (argued and briefed), Lancione & Simon, Cleveland, OH, for Plaintiff–Appellant.

Sally G. Cimini (argued and briefed), Robert J. Henderson (briefed), Polito & Smock, Pittsburgh, PA, for Defendants–Appellees.

Before: GUY, GILMAN, and GODBOLD,* Circuit Judges.

* The Honorable John C. Godbold, Circuit Judge of the United States Court of Appeals for the Eleventh Circuit, sitting by designation.

## OPINION

GILMAN, Circuit Judge.

Katherine R. Cehrs appeals from the district court's order granting summary judgment in favor of defendants Northeast Ohio Alzheimer's Research Center and Windsor House, Inc. (collectively "Northeast"). Cehrs claims that Northeast terminated her employment as a nurse in violation of the Americans with Disabilities Act, 42 U.S.C. §§ 12101–12213 (1994) ("ADA"), and the Family and Medical Leave Act of 1993, 29 U.S.C. §§ 2601–2654 (1994) ("FMLA"). For the reasons set forth below, we REVERSE the grant of summary judgment on Cehrs's ADA claim, AFFIRM the grant of summary judgment on Cehrs's FMLA claim, and REMAND the case for further proceedings consistent with this opinion.

## I. BACKGROUND

For thirty years, Cehrs has suffered from chronic generalized pustular psoriasis and psoriatic arthritis (collectively "psoriasis"). Psoriasis is defined as "a chronic and recurrent disease characterized by dry, well-circumscribed, silvery, scaling papules and plaques of various sizes." The Merck Manual of Diagnosis and Therapy 2283 (Robert Berkow et al. eds., 1987). Pustular psoriasis is the most severe form of psoriasis and "is characterized by sterile pustules." Id. at 2284. Cehrs's doctor characterized pustular psoriasis and psoriatic arthritis as "a red scalded skin appearance with pustules and some linings of pus in association with that, which is an inflammatory arthritis, ... involving all of [Cehrs's] joints but specifically her hands, her hips, her knees, and her feet." Psoriasis can be life threatening during "flare-ups," but is noticeable in its dormant stage only by skin lesions. These lesions do not directly interfere with Cehrs's ability to work. During the dormant stage of the disease, however, Cehrs receives medical treatment on a weekly basis to control the psoriasis.

Cehrs began working as a nurse for Northeast in June of 1991, and Northeast was aware of her medical condition when she was hired. Her work proceeded without incident until November of 1993, when Cehrs suffered a flare-up of her psoriasis triggered by a staph infection she had contracted in October of that year. During the flare-up, Cehrs was completely unable to work. She also was unable to perform common daily functions, such as driving a car or even dialing the telephone. This was Cehrs's first psoriasis flare-up since beginning work with Northeast, and her last flare-up had been approximately eight years earlier.

On November 26, 1993, Dr. Bergfeld (Cehrs's treating physician) wrote a note to Northeast explaining that Cehrs required a medical leave of absence. Upon obtaining the note, Northeast sent Cehrs a medical leave of absence form that she gave to Dr. Bergfeld to complete. Dr. Bergfeld completed the form without including an anticipated return date. When Northeast returned the form to Cehrs and specifically requested a return date, Dr. Bergfeld advised Northeast of a tentative return date of January 20, 1994.

After examining Cehrs on January 10, 1994, Dr. Bergfeld determined that her condition was still very severe and would require an additional month of leave. Dr. Bergfeld wrote a note to that effect, and Cehrs's daughter delivered the note to Northeast on January 11, 1994. Cehrs told her daughter to deliver the note to either Sally Beil (Northeast's administrator), Rose Kelly (Beil's secretary), or Barb Sladewski (Cehrs's immediate supervisor). Cehrs's daughter does not recall to whom she delivered the note. The note nevertheless was found in Cehrs's personnel file. Beil acknowledges that Kelly mentioned that a note had been delivered, but she does not recall reading the note. Kelly testified, however, that nothing goes into a personnel file without Beil seeing it. During her deposition, Beil acknowledged that if she had been aware of the doctor's note, she probably would have sent the leave-extension forms to Cehrs.

Cehrs met again with Dr. Bergfeld on February 14, 1994. At this time, Dr. Bergfeld determined that Cehrs had improved and could return to work on a part-time basis by March 1, 1994. She also estimated that Cehrs could begin working full-time on April 1, 1994. Dr. Bergfeld wrote a second note to Northeast conveying this information. Cehrs's stepdaughter hand-delivered the note, which was later found in Cehrs's personnel file. Although both notes were delivered, Cehrs failed to complete any additional medical leave forms, and Northeast never sent the forms to her.

While the above facts are undisputed, the parties are in disagreement over other relevant details. Cehrs, for example, claims that she spoke to Sladewski sometime after February 14, 1994, and that they discussed the possibility of Cehrs being placed on the work schedule for March. Cehrs contends that in response to her request to be placed on the schedule, Sladewski commented that she would inform Cehrs about the schedule shortly. But Sladewski denies speaking with Cehrs on that occasion. On February 28, 1994, because she never heard back from Sladewski, Cehrs claims that she arrived at Northeast to discuss the March schedule with both Sladewski and Beil. Cehrs further asserts that both Sladewski and Beil implied that Cehrs would be placed on the schedule. Sladewski and Beil, however, deny that they met with Cehrs on that date.

When Cehrs called Sladewski to discuss scheduling on March 1, 1994, Cehrs claims that Sladewski informed her that Beil had terminated Cehrs's employment as of January 20, 1994. Beil and Sladewski, on the other hand, maintain that Cehrs was terminated on February 28, 1994. Beil claims that Cehrs was terminated because she failed to complete the required paperwork to extend her leave of absence. Beil specifically stated that Cehrs was not fired because of poor performance, a reduction in force, scheduling changes, or excessive absences.

Following Sladewski's advice, Cehrs applied for rehire on March 3, 1994. On March 9, 1994, Cehrs's new treating physician (Dr. Mehle) examined Cehrs and determined that she could begin working full-time. Dr. Mehle wrote Northeast a note to this effect, and Cehrs delivered the note to Northeast. Northeast, however, did not rehire her. In-

stead, Northeast hired three new nurses between March and November of 1994.

Northeast's medical leave policy permits employees to take ninety days of unpaid leave and to file for a ninety-day unpaid extension, for a maximum of 180 days leave. Northeast claims that its policy permits employees to take an initial leave or to extend a leave only if they complete the proper forms in advance. Evidence exists in the record, however, that Northeast has in the past allowed employees to submit the requisite paperwork after their initial leave has begun and, in some cases, even after they have returned from leave.

Cehrs brought an action against Northeast on February 21, 1995, alleging that it fired her in violation of the ADA, the FMLA, and relevant state statutes. The district court granted Northeast's motion for summary judgment, holding that Cehrs failed to state a prima facie case under the ADA because she was not "otherwise qualified" within the meaning of the Act. In addition, the court determined that the FMLA was inapplicable because Cehrs was unable to return to work within the twelve weeks maximum leave permitted by the statute. Finally, the district court dismissed Cehrs's state-law claims without prejudice by refusing to exercise pendent jurisdiction over them. This appeal followed.

## II. ANALYSIS

### A. Standard of Review

This court reviews *de novo* a district court's grant of summary judgment. *E.E.O.C. v. Prevo's Family Market*, 135 F.3d 1089, 1093 (6th Cir.1998). Fed.R.Civ.P. 56(c) directs that summary judgment shall be granted if "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." A genuine issue for trial exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is material if its resolution will affect the outcome of the lawsuit. *Id.* All factual inferences "must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v.*

*Zenith Radio,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)).

### B. Cehrs's ADA Claim

The ADA prohibits employment discrimination based on an employee's disability. Specifically, the ADA mandates that:

> No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a) (1994). To defeat an employer's motion for summary judgment in response to an ADA claim, an employee must first make out a prima facie case of discrimination by establishing the following elements: "(1) he or she is disabled; (2) otherwise qualified for the position, with or without reasonable accommodation; (3) suffered an adverse employment decision; (4) the employer knew or had reason to know of the plaintiff's disability; and (5) the position remained open while the employer sought other applicants or the disabled individual was replaced." *Monette v. Electronic Data Sys. Corp.,* 90 F.3d 1173, 1186 (6th Cir.1996). The burden then shifts to the employer to provide a non-discriminatory explanation for the employment decision. *Id.* If the employer offers what appears to be a legitimate explanation, the employee then has the burden of "showing that the proffered explanation is pretextual." *Id.*

#### 1. The Prima Facie Case

Northeast does not dispute that Cehrs has met her burden with respect to the last three elements of her prima facie case. The first two components remain in contention.

*a. Is Cehrs disabled?* While the district court did not reach this question because it granted Northeast's motion on the basis that Cehrs was not "otherwise qualified" (the second element of the prima facie case standard), we must address the issue in

light of our decision to remand this case for further proceedings.

> The ADA defines a disability in the following way:
>
> (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
>
> (B) a record of such impairment; or
>
> (C) being regarded as having such an impairment.

42 U.S.C. § 12102(2). Cehrs argues that her claim falls under subsection (A) of the definition of disability. In response, Northeast contends that Cehrs is disabled only during "flare-ups" of her psoriasis, and therefore the psoriasis cannot be considered a physical impairment because of its allegedly transitory nature. We must consider the following three factors in order to determine whether Cehrs's psoriasis is a disability under subsection (A) above: (1) whether the disease constitutes a physical impairment; (2) whether the life activity purportedly curtailed as a result of the physical impairment constitutes a major life activity under the ADA; and (3) whether the physical impairment substantially limits this major life activity. *See Bragdon v. Abbott,* —— U.S. ——, ——, 118 S.Ct. 2196, 2202, 141 L.Ed.2d 540 (1998).

The regulations define a "physical impairment" as "[a]ny physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine." 29 C.F.R. § 1630.2(h)(1) (1998). Northeast relies on *Evans v. City of Dallas,* 861 F.2d 846 (5th Cir.1988), in support of its argument that Cehrs's psoriasis physically impairs her only during flare-ups, and therefore cannot be considered a disability under the ADA. In *Evans,* the plaintiff injured his knee and took leave in order to have knee surgery. The court refused to interpret this injury as a physical impairment within the meaning of the Rehabilitation Act of 1973, 29 U.S.C. §§ 701–797b ("Rehabilitation Act"), the precursor to the ADA. The court found that the Rehabilitation Act contemplated that the definition of a disability should be limited to an impairment of a continuing nature.

Northeast's reliance on *Evans,* however, is misplaced. Cehrs's condition more closely resembles the plaintiff's condition in *Roush v. Weastec, Inc.,* 96 F.3d 840 (6th Cir.1996). In *Roush,* the plaintiff suffered from interstitial cystitis, a chronic bladder inflammation which occasionally causes severe bladder infections. The plaintiff alleged that she was unable to work without medication and, even when medicated, she experienced intermittent pain that caused her to visit the doctor's office monthly or bi-monthly. The district court determined that the intermittent bladder infections were not physical impairments. This court reversed, concluding that the "bladder infections, though intermittent and temporary, are a characteristic manifestation of this physical impairment and, thus, are a part of the underlying impairment." *Id.* at 844; *see Vande Zande v. Wisconsin Dep't of Admin.,* 44 F.3d 538, 544 (7th Cir.1995) ("[A]n intermittent impairment that is a characteristic manifestation of an admitted disability is, we believe, a part of the underlying disability and hence a condition that the employer must reasonably accommodate.").

■ Similarly, Cehrs's flare-ups are manifestations of the pustular psoriasis. It is not necessary that she experience flare-ups on a daily basis in order to characterize pustular psoriasis as a physical impairment. Accordingly, we hold that Cehrs's case of psoriasis is a physical impairment because of the ongoing nature of the disease and its physiological impact even during its dormant stage. *See Bragdon,* —— U.S. at ——, 118 S.Ct. at 2204 (concluding that a person infected with the HIV virus has an immediate physical impairment because it has a "constant and detrimental effect on the infected person's hemic and lymphatic systems from the moment of infection").

We must next determine whether Cehrs has identified a major life activity affected by her psoriasis. Major life activities are defined as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i). Although the list provides helpful examples of major life activities, it is by no means exhaustive. *See, e.g., Bragdon,* —— U.S. at ——, 118 S.Ct.

at 2205 (concluding that reproduction is a major life activity). While many of Cehrs's major life activities are clearly limited during her flare-ups, she also contends that the major life activities of caring for herself and working are affected during the dormant stage. Because Cehrs has identified major life activities that are specifically listed in the regulations implementing the ADA, there is no dispute that she has satisfied her burden under the second element of the disability analysis.

Finally, we must consider whether Cehrs's physical impairment substantially limits these major life activities. The regulations outline the following factors to consider when determining whether an individual is substantially limited in a major life activity:

(i) The nature and severity of the impairment;

(ii) The duration or expected duration of the impairment; and

(iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment.

29 C.F.R. § 1630.2(j)(2).

█ There is no cure for psoriasis, and Cehrs's type of psoriasis is life-threatening. Even during the dormant stage of the impairment, Cehrs experiences pain. She receives weekly medication and treatment, even when the psoriasis is dormant. This medication sometimes causes her to lose her hair and fingernails, and occasionally causes her skin to peel. Indeed, "what is necessary to 'control' the condition may be part of what makes the person disabled." *Gilday v. Mecosta County*, 124 F.3d 760, 768 (6th Cir.1997) (Guy, J., concurring in part and dissenting in part) (reversing a grant of summary judgment in favor of the employer because a genuine issue of material fact existed as to whether an employee with diabetes being controlled by medication was disabled under the ADA). Because the psoriasis causes persistent skin irritations, Cehrs is constantly afraid of other people's reactions to her condition. Her entire appearance, including the clothes she wears, is dictated by her psoriasis. Accordingly, we conclude that Cehrs has raised a genuine issue of material fact regarding whether her psoriasis substantially limits the major life activities of being able to care for herself and to work.

██ *b. Is Cehrs "Otherwise Qualified" With a Reasonable Accommodation?* To satisfy the second element of the prima facie standard, an employee "must establish that a 'reasonable' accommodation is possible, and bears a traditional burden of proof that she is qualified for the position with such reasonable accommodation." *Monette v. Electronic Data Sys. Corp.*, 90 F.3d 1173, 1186 n. 12 (6th Cir.1996). The employee's initial burden of articulating a reasonable accommodation need not be onerous. For the purposes of a prima facie showing, the plaintiff must merely "suggest the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits." *Borkowski v. Valley Cent. School Dist.*, 63 F.3d 131, 138 (2d Cir.1995). As the Second Circuit recently noted, "[t]he regulations define reasonable accommodation only by example." *Id.* at 136. The examples include "[j]ob restructuring, part-time or modified work schedules, . . . and other similar actions." 34 C.F.R. § 104.12(b)(2).

If the employee establishes that a reasonable accommodation is possible, then the employer bears the burden of proving that the accommodation is unreasonable and imposes an "undue hardship" on the employer. *Monette*, 90 F.3d at 1186 n. 12. When considering undue hardship, the ADA requires the courts to consider the following factors:

(i) the nature and cost of the accommodation needed under this chapter;

(ii) the overall financial resources of the facility or facilities involved in the provision of the reasonable accommodation; the number of persons employed at such facility; the effect on expenses and resources, or the impact otherwise of such accommodation upon the operation of the facility;

(iii) the overall financial resources of the covered entity; the overall size of the business of a covered entity with respect to the number of its employees; the number, type, and location of its facilities; and

(iv) the type of operation or operations of the covered entity, including the composition, structure, and functions of the workforce of such entity.

42 U.S.C. § 12111(10)(B). To prove undue hardship, the employer has to show "both that the hardship caused by the proposed accommodation would be undue in light of the enumerated factors, and that the proposed accommodation is unreasonable and need not be made." *Borkowski*, 63 F.3d at 139. The employer, however, does not need to prove that the employee was unqualified. Instead, the employee must bear the burden throughout the litigation of proving that she is qualified.

Cehrs argues that she requested temporary leave as an accommodation for her psoriasis. Medical leave as an accommodation is not a novel concept. *See Ansonia Board of Education v. Philbrook*, 479 U.S. 60, 71–74, 107 S.Ct. 367, 93 L.Ed.2d 305 (1986) (Marshall, J., concurring in part and dissenting in part) (discussing leave as a reasonable accommodation for an employee's religious practices). Courts have disagreed about whether paid or unpaid leave can constitute a reasonable accommodation under the ADA. Some courts, including the district court in the instant case, have *presumed* that regular and predicable attendance is job requirement. *See Dutton v. Johnson County Bd. of County Com'rs*, 859 F.Supp. 498, 507 (D.Kan. 1994) (collecting cases). This presumption naturally leads to the conclusion that an individual who must occasionally request medical leave is unqualified. Other courts disagree. Most notably, the First Circuit recently held that leave may constitute a reasonable accommodation. In *Criado v. IBM Corp.*, 145 F.3d 437 (1st Cir.1998), the First Circuit upheld a jury verdict finding that IBM had violated the ADA by firing an employee who requested temporary leave to receive treatment for depression. The court held that Criado's request for leave was a reasonable accommodation and did not unduly burden IBM. *Id.* at 444. A similar conclusion was reached in *Norris v. Allied–Sysco Food Services, Inc.*, 948 F.Supp. 1418 (N.D.Cal. 1996), where the district court made the following observation:

> Upon reflection, we are not sure that there should be a *per se* rule that an unpaid leave of indefinite duration (or a very lengthy period, such as one year) could never constitute a "reasonable accommodation" under the ADA. It is not clear why unpaid leave should be analyzed differently from any other proposed accommodation under the ADA.

*Id.* at 1439. The *Norris* court also concluded that the employer's leave policy provided evidence that a medical leave of absence would not unduly burden the employer. *Id.* at 1440.

We find the above analysis persuasive. The presumption that uninterrupted attendance is an essential job requirement improperly dispenses with the burden-shifting analysis set forth in *Monette*. Under such a presumption, the employer never bears the burden of proving that the accommodation proposed by an employee is unreasonable and imposes an undue burden upon it. *See Kimbro v. Atlantic Richfield Co.*, 889 F.2d 869 (9th Cir.1989) (holding that a temporary leave of absence was a reasonable accommodation under the Washington Human Rights Laws). If an employer cannot show that an accommodation unduly burdens it, then there is no reason to deny the employee the accommodation.

In addition, the presumption eviscerates the individualized attention that the Supreme Court has deemed "essential" in each disability claim. *See School Bd. of Nassau County v. Arline*, 480 U.S. 273, 287, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987) (concluding that individual attention to cases under the Rehabilitation Act is essential). In *Arline*, the Supreme Court noted that in order to answer the question of whether a disabled person is otherwise qualified, "the district court will need to conduct an individualized inquiry and make appropriate findings of fact." *Id.* at 287, 107 S.Ct. 1123. The Court added that this type of inquiry is essential "to achieve [the] goal of protecting handicapped individuals from deprivations based on prejudice, stereotypes, or unfounded fear." *Id.* This type of inquiry also protects the employer from incurring unreasonable expenses or shouldering undue burdens. *Id.* If we were to presume that uninterrupted attendance in all instances is a mandatory job requirement, then the policies and needs of both the individual employer and employee would never be considered.

The presumption, moreover, leads to an illogical consequence. Prohibiting employees with disabilities from taking a leave of absence as a reasonable accommodation, while allowing other employees to take advantage of the employer's leave policies, would result in employees with disabilities being treated differently and worse than other employees. Indeed, Congress has already determined that uninterrupted attendance in the face of a family medical emergency is not a necessary job requirement and does not unduly burden employers. *See* 29 U.S.C. § 2601–2654 (1994) (outlining the details of the Family and Medical Leave Act). We therefore conclude that no presumption should exist that uninterrupted attendance is an essential job requirement, and find that a medical leave of absence can constitute a reasonable accommodation under appropriate circumstances.

In the instant case, Cehrs has presented proof that Northeast routinely granted medical leave to employees. Cehrs, moreover, despite her illness, had never requested an extended leave throughout her tenure at Northeast. In fact, Cehrs had not required an extended medical leave during the last eight years. Based on this pattern of attendance, a genuine issue of fact exists as to whether granting further medical leave to Cehrs would have unduly burdened Northeast, or instead would have constituted a reasonable accommodation to Cehrs under the ADA. *See Walton v. Mental Health Assoc. of Southeastern Pennsylvania,* No. CIV.A. 96–5682, 1997 WL 717053, at *5 (E.D.Pa. Nov. 17, 1997) (noting that summary judgment against the plaintiff was inappropriate because the court could not "hold as a matter of law that attendance—or more precisely that a particular level of attendance—was an essential element of plaintiff's job").

### 2. Northeast's Non–Discriminatory Explanation

Because we conclude that genuine issues of material fact remain in dispute concerning Cehrs's prima facie case, the burden of going forward will shift to Northeast to offer a non-discriminatory justification for the adverse employment action. Northeast justifies its termination of Cehrs's employment on the basis that Cehrs failed to follow the company's procedure for extending a leave of absence. It also argues that Cehrs's termination was too remote from when Northeast first learned of Cehrs's disability to constitute discrimination, and that Northeast had always accommodated Cehrs's psoriasis in the past, so it would have no reason to begin discriminating now.

Cehrs, on the other hand, argues that Northeast's proffered reason is pretextual. An employee can show pretext by offering evidence that the employer's proffered reason had no basis in fact, did not actually motivate its decision, or was never used in the past to discharge an employee. *Kocsis v. Multi–Care Management, Inc.,* 97 F.3d 876, 883 (6th Cir.1996). Cehrs relies on the latter two methods to prove pretext.

As to Northeast's justification for discharging Cehrs, it is undisputed that Northeast has a written policy that requires each employee to submit a specific form in order to extend a leave of absence. Northeast adds that firing Cehrs for failing to properly file a request for an extension is not discriminatory because it fired another employee for the same reason. The record is unclear, however, as to whether the other employee made any attempt to inform Northeast the employee's intention to return. In fact, the termination form for the other employee indicates that the employee never returned to work. It does not conclusively state that the failure to properly file an extension form was the cause of the termination.

In *Criado v. IBM Corp.,* 145 F.3d 437 (1st Cir.1998), IBM similarly argued that it fired Criado because of "her failure to report to work, rather than because of her disability or her need for an accommodation." *Id.* at 444. The First Circuit concluded that the evidence was sufficient to uphold the jury verdict in the employee's favor because IBM was on notice that Criado suffered from a disability. The court noted that "[a]n employee's request for reasonable accommodation requires a great deal of communication between the employee and employer[;] ... both parties bear responsibility for determining what accommodation is necessary." *Id.* (quoting *Bultemeyer v. Fort Wayne Community Schools,* 100 F.3d 1281, 1285 (7th Cir.1996)).

The court also rejected IBM's justification that it never received the note from Criado's doctor requesting the leave. Instead, the court determined that IBM should have reinstated Criado as soon as it learned from her doctor of the earlier requests for leave. *Id.* The court relied on *Bultemeyer,* which held that the employer should have "reconsider[ed] the decision to terminate [a disabled employee's] employment" when it received the physician's letter requesting additional medical leave, even though the letter arrived after the employee was fired. *Bultemeyer,* 100 F.3d at 1286. Finally, the court rejected IBM's claim that Criado was fired for excessive absenteeism and that IBM had already accommodated her by granting previous leaves. The court held that the duty to accommodate is "a continuing one." *Criado,* 145 F.3d at 445 (quoting *Ralph v. Lucent Techs. Inc.,* 135 F.3d 166, 172 (1st Cir.1998)).

Like the facts in *Criado,* Cehrs provided notice in the form of doctor's notes that she required additional leave. The doctor's notes in the present case were found in Cehrs's personnel file, raising the reasonable inference that Beil had read the notes. But even if we were to assume that Beil did not find out about the notes until March, Northeast still had the opportunity to reconsider its adverse employment action when Cehrs followed Sladewski's advice and reapplied for a position shortly after she was terminated.

Cehrs further argues that notwithstanding its official policy requiring an employee to submit the medical leave forms in advance, Northeast routinely distributed these forms after-the-fact to employees who required leave. Cehrs argues that she reasonably relied on this custom and practice and expected that the notes from her doctor would suffice to put Northeast on notice that Cehrs was requesting an extension of her leave. Indeed, Beil acknowledged that Cehrs would likely have been permitted to continue her leave if the proper forms had been completed.

The district court, on the other hand, stated that a qualitative distinction exists between initial leave requests and leave extensions, because extensions are more predictable. It therefore concluded that an employee should have a greater responsibility for obtaining the extension forms. But this ignores the fact that Beil conceded that she probably would have sent the leave-extension forms to Cehrs if Beil had been aware of the doctor's notes timely placed in Cehrs's personnel file. Moreover, selective enforcement of company procedures provides little guidance for employees in need of medical leave. Cehrs claims that she reasonably relied on her prior knowledge of Northeast's actual practice in distributing leave forms.

As for Northeast's propositions that "the termination of Ms. Cehrs was so remote from [its] acquisition of the knowledge of Ms. Cehrs' condition that the claim of discrimination should be found refuted," and that it is unreasonable to conclude that now it would choose to discriminate against Cehrs and terminate her employment because of her psoriasis when it had always accommodated her in past, we find these arguments unpersuasive in the summary judgment context. These arguments are more appropriate to present to a jury than as a basis for judgment as a matter of law. Furthermore, the accommodation requested by Cehrs in the instant case differs substantially from the minor rescheduling accommodated in the past. There is no reason to assume that because Northeast had accommodated Cehrs with her routine doctor visits, that it would not discriminate now when faced with a more burdensome accommodation.

Based on all the above, we conclude that a genuine issue of material fact exists as to whether Northeast is entitled to rely on its proffered reason for terminating Cehrs.

## C.  Cehrs's FMLA Claim

The FMLA provides that "an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12–month period" because of a serious medical condition making the employee unable to work. 29 U.S.C. § 2612(a)(1)(D) (1994). Cehrs's leave began on November 22, 1993, and her leave under the FMLA would have ended on February 12, 1994.

It is undisputed that on February 12, 1994, Cehrs was still unable to work. Cehrs argues that Northeast back-dated her termination to January 20, 1994. Northeast disputes this assertion and claims that Cehrs

was fired as of February 28, 1994. Regardless of which date is correct, Cehrs was clearly unable to return to work within the period provided by the FMLA. As the district court noted, "it would be elevating form over substance to say that the effective termination date chosen by [Northeast] is meaningful to the Court's analysis under the FMLA."

Accordingly, we conclude that Cehrs failed to raise a genuine issue of material fact concerning her claim under the FMLA. Northeast was therefore entitled to summary judgment on this claim for the reasons set forth in the district court's Memorandum and Order.

### D. Pendent State Law Claims

Because we have concluded that genuine issues of material fact remain in dispute regarding Cehrs's ADA claim, her state law claims should also be reinstated for further consideration.

### CONCLUSION

For all the reasons stated above, we REVERSE the grant of summary judgment on Cehrs's ADA claim, AFFIRM the grant of summary judgment on Cehrs's FMLA claim, and REMAND the case for further proceedings consistent with this opinion.