NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 13a1011n.06

No. 13–5467

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Dec 03, 2013
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| STEVEN CASH, | ) | |
| | ) | |
| Plaintiff – Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR THE |
| | ) | WESTERN DISTRICT OF TENNESSEE |
| SIEGEL-ROBERT, INC., | ) | |
| | ) | OPINION |
| Defendant – Appellee. | ) | |
| | ) | |

Before:  COOK and STRANCH, Circuit Judges, and CARR, District Judge.[*]

**JANE B. STRANCH**, Circuit Judge.  Steven Cash appeals the district court's grant of

summary judgment in favor of his former employer, Siegel-Robert, Inc. (SRI), on his claims brought

under the Americans With Disabilities Act (ADA) for failure to accommodate his disability and

discriminatory discharge.  Because Cash did not produce sufficient proof to establish his prima facie

case on either claim, we AFFIRM.

## I.  FACTS

Cash began working full-time for SRI in January 2007.  He was placed in various jobs,

including assembly line worker, machine operator, and mold setter.  In early 2009 Cash worked as

a mold setter on a three-person team responsible for loading two or three molds into presses each

---

[*]The Honorable James G. Carr, Senior United States District Judge for the Northern District
of Ohio, sitting by designation.

day. The molds varied in weight from 500 pounds to 32,000 pounds. Placing the molds required the use of heavy equipment and frequent standing, lifting, stooping, crawling, and climbing.

On January 12, 2009, Cash visited Dr. LaVerne Lovell complaining of continuing back pain. Dr. Lovell scheduled Cash for back surgery on March 18 and told him that he probably would not work for one year after the surgery. SRI granted Cash a medical leave of absence from his employment for a period of six months, from March 18 to September 17. A third party administrator, Aetna, managed Cash's short-term disability leave.

SRI's "Maximum Medical Leave of Absence Termination Policy" provided in pertinent part:

> If an employee is unable to perform, with or without reasonable accommodations, the essential functions of his or her position, or another position that the Company may offer, for a period of 6 months within any 12 month period his/her employment will be automatically terminated, unless prohibited by law.
>
> Any employee subject to termination under this policy may apply for an extension of his/her leave. Requests for extensions will not be considered unless they (a) are received by the Company before termination would otherwise take effect and (b) include medical documentation demonstrating that the employee will be able to return to work, with or without reasonable accommodations, on a date certain within a reasonable time after termination would otherwise take effect.

R. 19-3 Page ID 161.

According to SRI's Human Resources Manager, Carolyn Howard, Cash received a copy of the policy at the beginning of his leave and he was informed that SRI no longer provided a one-year medical leave of absence. Instead, the company provided six months of medical leave, and if that period of leave was exhausted, Cash would be eligible for long-term disability benefits (LTD). She did not explain to Cash how to obtain an extension of the six-month leave period because he did not ask. She instructed him to communicate with Aetna about his short-term disability benefits.

During the medical leave, Aetna kept SRI apprised of Cash's status without disclosing any of his personal medical information. Aetna provided SRI with the date Cash's disability began, his current status, and his "approved through date." During the leave period, Cash provided Howard with three of his doctor's notes, but these notes are not in the evidentiary record.

Following surgery, Cash attended monthly appointments with Dr. Lovell, who did not set a definite return-to-work date. After an August 17 office visit, Dr. Lovell noted in Cash's medical chart that, after a course of physical therapy for four weeks, "I will see the patient back in a month. Hopefully at that time, we can release him to a work status." Dr. Lovell did not discuss this plan with Cash and a form Dr. Lovell completed for Aetna on August 19 stated that Cash was off work until his next followup appointment on September 14 because Cash was in "physical therapy now." The form did not mention a return-to-work date. Therefore, as of August 17, Cash did not know if or when he would be released to return to work even though he had asked Dr. Lovell to release him because he thought he could return to his job. Having obtained Cash's medical records from Dr. Lovell, Aetna made an entry in its records that Dr. Lovell specified September 18 as a return-to-work date.

At some point during August or September, Cash asked Howard for guidance in applying for LTD benefits. Based on this conversation, Howard believed that Cash was not able to return to work and would begin receiving LTD benefits at the end of his six-month medical leave. On September 15 Cash filed the LTD application with Aetna.

Cash was unable to attend his scheduled September 14 office visit with Dr. Lovell so he rescheduled the appointment for September 21. Cash does not recall asking Howard to extend his medical leave of absence in accordance with company policy. He also did not ask to return to work

in a different position because he knew his doctor had not released him to work. Howard asserts that Cash did not tell her he had a doctor's appointment on September 21 and she was not otherwise aware of the appointment.

At the September 21 office visit, Dr. Lovell strongly advised Cash to remain off work, but Cash pressured Dr. Lovell for a release because he had heard that SRI was laying off workers at the plant. Dr. Lovell agreed to release Cash to return to work on physical restrictions for six months, included lifting no more than ten pounds, no repetitive bending or stooping, and sitting or standing as needed. Dr. Lovell noted in Cash's medical chart that these restrictions were "not in keeping" with Cash's job as a mold setter.

Upon receiving the work release, Cash went directly to the plant and handed the document to Howard. She looked at it briefly, gave it back to him, and told him that SRI had terminated his employment three days earlier on September 18 when his six-month medical leave expired. Howard alone made the decision to terminate Cash's employment. She did not offer him a different position or part-time work. Had she done so, Cash would have accepted any work offered. Cash left the plant without speaking to anyone else about his employment. SRI entered the employment termination into its computer database on September 23, and a separation notice issued on September 30.

During August and September 2009, SRI conducted plant-wide layoffs based on seniority and job classification. SRI terminated the employment of some workers who had several years more seniority than Cash. According to Howard, employees with no definite return-to-work date were discharged for lack of work as permitted by company policy, and if Cash's work restrictions as of September 21 precluded him from returning to his job, there would not have been a full-time

-4-

position in a lower job classification open at that time. Consequently, Cash would have been discharged even if his employment had not been terminated three days earlier in accordance with the medical leave policy. Howard explained that employment availability at SRI during this time period varied week to week and there were some employees who returned to their jobs without losing their seniority. A long-time SRI employee averred in support of Cash that SRI hired numerous new employees for full-time and part-time positions after Cash's employment termination in September 2009. A majority of the new employees working second shift in the molding department were hired after his termination.

Although Cash could reapply for employment under the medical leave policy and SRI's separation notice, he did not do so. Aetna denied his application for LTD benefits. Cash then filed an administrative charge of disability discrimination with the Equal Employment Opportunity Commission. On March 2, 2010, upon receiving a copy of Cash's EEOC charge, Howard called Aetna to determine the status of Cash's LTD application and learned the application had been denied. Cash filed suit under the ADA claiming that SRI discriminated against him by denying him the chance to work with or without a reasonable accommodation and by terminating his employment under an "inflexible blanket policy."

After Cash filed this action, SRI adopted a new practice to communicate with an employee who is nearing the end of a medical leave of absence. SRI sends the employee a certified letter noting the date the leave will expire and how to request an extension if needed. SRI asserts that this practice qualifies as a subsequent remedial measure under Federal Rule of Evidence 407, and any evidence about the practice is inadmissible. Cash contends he may rely on evidence about this new practice to show the feasibility of precautionary measures and for  impeachment purposes.

## II.  STANDARD OF REVIEW

We review *de novo* a district court's grant of summary judgment.  *Cehrs v. Northeast Ohio Alzheimer's Research Ctr.*, 155 F.3d 775, 779 (6th Cir. 1998).  Summary judgment is proper if there is not a genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  *Id.*  We view the facts, and the reasonable inferences to be drawn from those facts, in the light most favorable to the non-moving party, and we do not weigh the evidence or make credibility determinations.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Keith v. Cnty. of Oakland*, 703 F.3d 918, 923 (6th Cir. 2013).

## III.  ANALYSIS

Under the ADA, an employer may not "discriminate against a qualified individual on the basis of disability."  42 U.S.C. § 12112(a); *Keith*, 703 F.3d at 923.  An employer's decision to discharge an employee on the basis of disability or an employer's failure to provide a reasonable accommodation can constitute the type of unlawful discrimination barred by the statute.  *Keith*, 703 F.3d at 923.  Cash contends that SRI discriminated against him by failing to provide a reasonable accommodation for his return to work on restrictions and by terminating his employment.

An ADA claim premised on an employer's failure to provide a reasonable accommodation unavoidably "involve[s] direct evidence (the failure to accommodate) of discrimination" because the employer necessarily relied on the worker's disability in making decisions.  *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868–69 (6th Cir. 2007).  In other words, if the fact-finder adopts the employee's version of the facts, there is no need to draw factual inferences to determine whether the employee proved this form of discriminatory conduct under the ADA.  *Id.* at 868.  Consequently, if the plaintiff presents direct evidence of the employer's failure to offer a reasonable

accommodation, there is no need for a court to utilize the *McDonnell Douglas* burden-shifting formula that is helpful in circumstantial evidence cases. *Id.* at 869. The *McDonnell Douglas* paradigm is used, however, to evaluate a plaintiff's claim that his discharge from employment was discriminatory. *Id.* & n.2.

## A. Failure-to-accommodate claim

To prove a claim of failure to provide a reasonable accommodation, Cash has the burden to show that (1) he is disabled within the meaning of the ADA and that (2) he is "otherwise qualified" for the position he holds or desires despite his disability: "(a) without accommodation from the employer; (b) with an alleged 'essential' job requirement eliminated; or (c) with a proposed reasonable accommodation." *Hedrick v. Western Reserve Care Sys.*, 355 F.3d 444, 452 (6th Cir. 2004) (quoting *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1186 (6th Cir. 1996)); *Burns v. Coca-Cola Enter., Inc.*, 222 F.3d 247, 256 (6th Cir. 2000). If Cash carries his burden, then SRI bears "the burden of proving that a challenged job criterion is essential, and therefore a business necessity," or that a proposed accommodation would impose an undue hardship on SRI. *See id.* (quoting *Monette*, 90 F.3d at 1186).

Cash's failure-to-accommodate claim lacks support because there is no proof that he asked SRI to grant him a reasonable accommodation to return to his job as a mold setter or to transfer him to a less strenuous job commensurate with his physical restrictions. *See Hammon v. DHL Airways, Inc.*, 165 F.3d 441, 450 (6th Cir. 1999); *Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1046–47 (6th Cir. 1998). Cash does not argue that he could return to his job without a reasonable accommodation. An employee who contends that he is otherwise qualified with a reasonable accommodation bears the initial burden to propose an accommodation and show that the

accommodation is objectively reasonable. *Kleiber*, 485 F.3d at 870. If the requested accommodation is a job transfer, the employer has a duty to locate a suitable position for the employee with a disability. *Id.* "Nonetheless, to overcome summary judgment, the plaintiff generally must identify the specific job he seeks and demonstrate that he is qualified for that position." *Id.*

Unfortunately, the record before us reveals that Cash did not take either approach. He presented his work release to Howard as soon as he received it, but when she told him that his employment had been terminated in accordance with the medical leave policy, Cash simply left the building. He did not propose a reasonable accommodation that would allow him to return to his job, nor did he request a transfer to a less-demanding job. *See Burns*, 222 F.3d at 258; *Gantt*, 143 F.3d at 1046–47. Even interpreting the presentation of the work release as a tacit request for reasonable accommodation, SRI had already discharged Cash pursuant to a written leave policy that required him to request an extension of his medical leave before it expired or face employment termination. *See id.* at 1046. Because Cash did not seek a timely leave extension or a reasonable accommodation, he has not produced sufficient evidence to reach the jury with his claim that Howard should have engaged in the interactive process with him even after his discharge. Finally, Cash did not reapply for employment at SRI, even though the medical leave policy allowed him to do so and he was eligible to be rehired.

These deficiencies in proof compel us to hold under these specific facts that Cash did not meet the second element of his prima facie case. *See Hedrick*, 355 F.3d at 452. Accordingly, summary judgment was properly granted on the failure-to-accommodate claim.

**B. Discharge claim**

Cash's claim of discriminatory discharge in violation of the ADA also lacks sufficient support to survive summary judgment. To demonstrate a prima facie case, Cash "must show that (1) he is disabled; (2) he is otherwise qualified for the position with or without reasonable accommodation; (3) he suffered an adverse employment decision; (4) his employer knew or had reason to know of his disability; and (5) his position remained open." *Hammon*, 165 F.3d at 449.

Cash's claim again fails on the second element. He admits that he possessed a copy of the medical leave policy, which expressly explained the process for requesting an extension of medical leave if needed. Cash knew that his medical leave would expire on September 18 and he also knew that he rescheduled a doctor's appointment for September 21, after the expiration of his leave period. Before September 18 he did not ask SRI for additional time on medical leave and he did not provide medical documentation demonstrating that he would be able to return to work, with or without reasonable accommodation, on a date certain within a reasonable time after termination would otherwise take effect, as the policy mandated. Instead, on September 15, Cash filed an application for LTD benefits and allowed his medical leave to expire on September 18. Cash's conduct signaled to Howard that Cash was unable to return to work at the end of his medical leave, and having not received any request for an extension of the leave, she terminated his employment in accordance with the policy.

Cash argues that Howard was required to reconsider the termination decision when he presented her with the work release on September 21. In support he relies on *Cehrs v. Northeast Ohio Alzheimer's Research Ctr.*, 155 F.3d 775 (6th Cir. 1998), *Bultemeyer v. Fort Wayne Cmty. Schs.*, 100 F.3d 1281 (7th Cir. 1996), and *Criado v. IBM Corp.*, 145 F.3d 437 (1st Cir. 1998), cases

in which employees either had provided notice of their continuing need for medical leave to their employers prior to expiration of their medical leave periods or had requested reasonable accommodation.

In *Cehrs*, the employee provided doctor notes to her employer which were inadvertently placed in her personnel file before the head administrator had an opportunity to see them. The administrator conceded that, had she reviewed the notes, she likely would have sent leave extension forms to Cehrs. 155 F.3d at 778–79. The only dispute in that case was whether the employee could be terminated under the leave policy when she failed to request an extension on a specific form. *Id.* at 783. But that employee had sought an extension before the leave period ended. Moreover, we noted that the company "still had the opportunity to reconsider its adverse employment action when Cehrs followed [her supervisor's] advice and reapplied for a position shortly after she was terminated." *Id.* at 784.

Here, the facts are far different. Even accepting as true Cash's testimony that he provided doctor notes directly to Howard, those notes are not in the record for our review and Cash does not offer any information about the notes' content. Nor does Cash allege selective enforcement of company procedures. We cannot speculate that Howard would have granted an extension based on the notes. Further, Cash did not reapply for employment as Cehrs did. *See id.*

*Bultemeyer* and *Criado* similarly present facts that are distinguishable from the case before us. In *Bultemeyer*, the interactive process required by the ADA was still ongoing when the employer terminated the worker's employment, 100 F.3d at 1284–87, and in *Criado* the plaintiff presented sufficient evidence of discrimination in the face of requests for continuing medical leave to win

-10-

damages at a jury trial. 145 F.3d at 439–41. By contrast, Cash has not produced enough evidence to survive SRI's summary judgment motion on the discharge claim.

## IV. CONCLUSION

It is regrettable that Cash did not receive the LTD benefits for which he applied nor was he returned to work, and we are sympathetic to his plight. But as we apply the ADA standards to the specific facts on the record before us, we are unable to provide Cash with any relief. Because the district court correctly granted summary judgment, we need not address the dispute about whether evidence of a subsequent remedial measure is admissible under Rule 407 or SRI's alternative argument that Cash's employment would have been terminated for lack of work in any event. Accordingly, we AFFIRM the judgment of the district court.