**Isabel WHITE, Plaintiff,**

v.

**HONDA OF AMERICA MFG., INC., et al, Defendants.**

**No. C2–00–1364.**

United States District Court, S.D. Ohio, Eastern Division.

March 21, 2002.

934

Laren E. Knoll, McGuire Law Office, Columbus, OH, for plaintiff.

Theodore P. Mattis, Vorys Sater Seymour & Pease, Columbus, OH, for defendant.

## OPINION AND ORDER

SARGUS, District Judge.

This matter is before the Court for consideration of (A) Plaintiff Isabel White's ("Plaintiff") Motion to Strike Affidavits of Cathy Cronley, Chris Tucker, and Joseph Berner [hereinafter *"Plaintiff's Motion to Strike"*]; (B) Plaintiff's Motion for Leave to File a Surreply; and Defendant's Motion to Strike Plaintiff's Motion to File Surreply and to Strike New Affidavit Attached Thereto, or in the alternative, Motion for Leave to File Response to Surreply (collectively *"Defendant's Motion Opposed to Surreply"*); and (C) Defendant Honda of America's ("Defendant" or "Honda") Motion for Summary Judgment. (Doc. # 22; Doc. # 25; Doc. # 27; Doc. # 16).

Plaintiff brought this action alleging (1) disability discrimination in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112 *et seq.*, and in violation of the Ohio Revised Code ("O.R.C.") §§ 4112.02 and 4112.99; (2) wrongful discharge in violation of Ohio public policy; and (3) intentional infliction of emotional distress. (Doc. # 1).[1] The Court exercises jurisdiction over this matter pursuant to 28 U.S.C. § 1331.

For the reasons set forth below, both of Plaintiff's Motions are **DENIED** and Defendant's Motion Opposed to Surreply is **GRANTED**. Further, Defendant's Motion for Summary Judgment is **DENIED IN PART** and **GRANTED IN PART**.

---

1. Additionally, Plaintiff originally alleged a claim of promissory estoppel. Plaintiff dismissed this claim without prejudice pursuant to Rule 41(a) of the Federal Rules of Civil Procedure. (*Plaintiff's Memorandum Contra,* at 3).

## I.

Plaintiff was hired on June 5, 1989, to work as an hourly employee in Defendant's Marysville, Ohio automobile plant. (Pl. Dep.(I)[2] at 21, 27–28). Before her termination, Plaintiff held positions in the weld department, parts supply, and the assembly line. (Pl.Dep.(I) at 28, 29–30, 37–38). During the last eight (8) years of Plaintiff's employment, from 1992 through 2000, she worked in the C–1, line 1 area of the assembly line. (Pl.Dep.(I) at 37–38, 41).

In 1996, Plaintiff was diagnosed with breast cancer. (*Complaint* ¶ 6). Plaintiff underwent a mastectomy and returned to work within one (1) week. (*Id.*). Plaintiff underwent chemotherapy and is currently in remission from the breast cancer. (Pl. Dep.(I) at 47–50).

On November 3, 1997, Plaintiff's Oncologist, Sharon K. Cole, M.D., diagnosed Plaintiff with low grade non-Hodgkins Lymphoma ("Lymphoma"). (Cole Dep. at 6–7, 16). As part of Plaintiff's treatment, she underwent three (3) types of chemotherapy throughout the course of the following year. (Cole Dep. at 18). Plaintiff continued to work during her chemotherapy and also received intermittent leave under the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et seq.* (Pl. Dep.(I) at 51, 54, 59). During September of 1998, Defendant approved Plaintiff's request for four (4) months of medical leave so that she could undergo a more aggressive chemotherapy. (Pl.Dep.(I) at 51; *Plaintiff's Memorandum Contra Defendant's Motion for Summary Judgment,* Ex. B) [hereinafter *"Plaintiff's Memorandum Contra"*]. During this more inten-

sive chemotherapy, Plaintiff initially experienced an improvement in the Lymphoma symptoms. By December of 1998, however, she suffered a relapse. (Cole Dep. at 17–18).

Dr. Cole determined that Plaintiff's condition necessitated a bone marrow transplant and referred Plaintiff to Dr. Matt Kalaycio at the Cleveland Clinic. (Cole. Dep. at 18–19). Dr. Cole and Dr. Kalaycio recommended a one (1) year leave of absence for Plaintiff to obtain the bone marrow transplant. (Cole Dep. at 23). Defendant approved Plaintiff's requested leave on January 21, 1999. (*Complaint* ¶ 7; *Plaintiff's Memorandum Contra,* Exs. C and D). Plaintiff was required by Defendant to work one day in order to be eligible for the one year medical leave. (*Complaint* ¶ 7). Thus, Plaintiff worked a partial day on January 21, 1999. (*Complaint* ¶ 9). The purpose of requiring Plaintiff to work one day was to avoid application of Defendant's "12–month policy," which provides in relevant part:

> The following will result in your separation[3] from employment; and will end your associate service when you ... [a]re not actively employed by [Defendant] for any reason for twelve (12) consecutive months unless on approved leave of absence due to an occupational injury or illness, serving the armed forces, on an educational leave, or laid off.

(Pl.Dep.(I) at 42–43, Ex. 5). Thus, Plaintiff's return to work for one day allowed her to receive a twelve month medical

---

**2.** Although Plaintiff's discovery deposition took place during the course of a single day, the court reporter who began the deposition became ill and a second court reporter was substituted. Each court reporter subsequently produced separate transcripts of the deposition, both of which begin with page "1." As a result, the transcript produced by the origi-

nal reporter is designated herein with the roman numeral "I," while the transcript produced by the substitute reporter is designated with the roman numeral "II."

**3.** Defendant refers to termination of employment as "separation."

leave of absence without violating Defendant's 12–month policy.

On February 3, 1999, Plaintiff underwent a bone marrow transplant at the Cleveland Clinic. (Cole Dep. at 23). Plaintiff remained at the Cleveland Clinic for six (6) months. (Pl.Dep.(I) at 68). Immediately following the bone marrow transplant, Dr. Kalaycio diagnosed Plaintiff with Graft–versus–Host ("GvH") disease.[4] (Cole Dep. at 25). Dr. Cole used steroids to treat the GvH disease. (Cole Dep. at 61). On January 3, 2000, Plaintiff saw Dr. Cole, who determined that Plaintiff was still having problems with the GvH disease and did not seem ready to go back to work. (*Id.*).

On January 11, 2000, Honda received a medical document prepared by Dr. Cole requesting a four (4) month extension of Plaintiff's medical leave. (Pl.Dep.(II) at 47–48, 50, 53, 55 and Ex. 10). Plaintiff was worried about losing her job if she were not able to return to work by January 21, 1999, because of Defendant's 12–month policy. (Pl.Dep.(II) 68–69). Plaintiff contacted Defendant sometime between January 11, 2000 and January 19, 2000 and spoke with Associate Relations Representative Rod Sewer. (Pl.Dep.(II) at 54–55). Mr. Sewer informed Plaintiff that her fear was not unfounded because she would in fact be terminated, pursuant to the 12–month policy, if she was unable to return to work by January 22, 2000. (*Defendant's Memorandum in Support of Defendant's Motion for Summary Judgment*, at 11 [hereinafter *"Defendant's Memorandum in Support "*]; Pl. Dep. (I) at 62).

On January, 18, 2000, Plaintiff requested a work release from Dr. Cole so that she would be able to work on January 19, 2000. (Pl.Dep.(II) at 66). Dr. Cole, however, was unable to see Plaintiff for a medical checkup prior to January 20, 2000. (Cole Dep. 35). Consequently, on January 18, 2000, the doctor released plaintiff to return to work for only one (1) day, January 19, 2000. (Cole Dep. 35; Pl Dep. at 66 and Ex. 11).

On January 19, 2000, Plaintiff reported to work with her one day work release and her blood test results from January 3, 2000. (Pl.Dep.(II) at 52–54; *Plaintiff's Memorandum Contra*, Ex. G, H). Plaintiff went to Honda's medical department, where she first met with Cathy Cronley, a Licensed Practical Nurse. (Cronley Dep. 7, 9, 22). After reviewing the documentation, Nurse Cronley left the room, and returned to inform Plaintiff that she was not allowed to work that day. (*Defendant's Memorandum in Support*, at 11; Pl. Dep. (II) at 74). Cronley informed Plaintiff that Defendant "did not believe she was physically capable of performing production work." (*Defendant's Memorandum in Support*, at 12; Pl. Dep. (II), at 74, 79).

Before Plaintiff left the automobile plant that day she met with Associate Relations Representative Chris Tucker. (Pl. Dep.(II), at 80). Tucker also told her that Honda did not believe she was physically able to work, given the medical records she had submitted. (*Defendant's Memorandum in Support*, at 12; Pl. Dep. (II), at 85). Tucker further informed Plaintiff

---

4. Dr. Cole described GvH disease as follows: [Plaintiff's] brother was her donor. And even though he was a match for bone marrow, he's not an identical match. Therefore, her immune system sees him as foreign and will more or less attack his bone marrow. And, that's actually a beneficial side effect, because it helps go after any residual lymphoma cells in the body. So you want to have [GvH] disease but in a very controlled setting. If it is uncontrolled, it's fatal. If you don't have any [GvH disease], you usually relapse. So you kind of work a fine balance.
(Cole Dep. at 24–25).

that the 12–month rule would apply, and that she would be terminated if she was unable to return to work by January 22, 2000. (*Defendant's Memorandum in Support,* at 12; Pl. Dep. (II) at 88). Plaintiff then went home and did not work in any capacity on January 19, 2000. (Pl.Dep.(II) at 74, 91).

On January 20, 2000, Plaintiff underwent blood tests at Hardin Memorial Hospital and then attended an office appointment with Dr. Cole. (Cole Dep. at 29; Pl. Dep. (II) at 101–02; *Plaintiff's Memorandum Contra,* Ex. I). Dr. Cole reviewed Plaintiff's blood tests and concluded that Plaintiff's GvH disease had rapidly improved since her January 3, 2000, blood tests. (Cole Dep. at 28). Dr. Cole determined that Plaintiff was capable of returning to work without any medical restrictions. (Cole Dep. at 43). Thus, the doctor released Plaintiff to work without medical restriction beginning January 21, 2000. (Cole Dep. at 45; Pl. Dep. (II) at 104 and Ex. 13).

On January 21, 2000, Plaintiff reported to work. (Pl. Dep. at 104, 107 and Ex. 13). Nurse Cronley accepted Plaintiff's work release and left the room for approximately thirty (30) minutes. (Pl. Dep. (II) at 108, 110). When the nurse returned, she "informed Plaintiff that [Defendant] would not permit her to work that day because [Defendant] did not believe, based on the collective medical documentation submitted by Plaintiff, that she was medically fit to return to work." (*Defendant's Memorandum in Support,* at 12; Pl. Dep. at 108, 110).

Before Plaintiff left her place of employment that day she met with Tucker in Associate Relations. (Pl.Dep.(II) at 115). Tucker again told Plaintiff that [Honda] would not permit her to work that day because [it] did not believe she was medi-

cally able to work. (*Defendant's Memorandum in Support,* at 13; Pl. Dep. (II) at 112–115; *Plaintiff's Memorandum Contra,* Ex. M). Tucker said that he would initiate an investigation into the matter. (Tucker Dep. at 50–52; *Plaintiff's Memorandum Contra,* Ex. M). Plaintiff persisted in requesting to be allowed to work that day and in requesting that Mr. Tucker call Dr. Cole to verify her ability to return to work. (Pl.Dep.(II) at 115). Tucker stated that he was still "reviewing" Plaintiff's medical records and instructed Plaintiff to leave. (*Id.*). Plaintiff asked to speak to other Honda executives, but was refused by Tucker.

Tucker thereafter reviewed whether Plaintiff was medically able to return to her job. (Tucker Dep. at 19). On January 21, 2000, he spoke with Nurse Cronley who told him that on January 19, 2000, Plaintiff's blood count was down and her body was rejecting the bone marrow. (*Plaintiff's Memorandum Contra,* Ex. N.). Also, Cronley noted that Plaintiff exhibited a non-productive cough. (*Id.*). Further, Plaintiff allegedly told the nurse that she should not be around people because she was very susceptible to infection. (*Id.*). Plaintiff denies the substance of the conversation as recounted by Cronley and has testifies that Dr. Cole did not instruct her to avoid people because of the possibility of infection. (*Id.* at 12, 14).

After meeting with Ms. Jackson, Assistant Manager of the Medical and Health Services for Honda, on January 27, 2000, Tucker reported:

> Associate attempted to [return to work] for 1 day on 1/19. In plant medical had medical concerns and did not permit associate to return. Associate attempted to [return to work] again for only[5] 1 day on 1/20. Again associate not permitted to [return to work]. Medical

---

**5.** It is unclear whether this word, "only," was crossed out or not.

documentation exists with reason for medical concern. Medical contacted the associate's personal physician. No [additional] information was provided that convinced them associate was medically capable of returning to active employment.

(*Plaintiff's Memorandum Contra,* Ex. O).

Ms. Jackson and Nurse Cronley both believed that Plaintiff should not be allowed to return to work. (Jackson Dep. at 59). There is disagreement, however, as to whether Ms. Jackson did in fact speak with Plaintiff's doctor's staff. Ms. Jackson claims that she spoke with someone in Dr. Cole's office, yet she could not understand the person when she was told their name. (*Plaintiff's Memorandum Contra,* at 16 and Ex. S). Dr. Cole testified that she did not receive any messages from Defendant and is not aware of Defendant speaking with any of her office personnel. (Cole Dep. at 49–50). Defendant does, however, produce a memorandum written by Ms. Jackson which memorialized the alleged conversation. (*Plaintiff's Memorandum Contra,* Ex. R). The memorandum states, in relevant part:

I asked for clarification of the documents provided to [Honda] during the month of January [2000]. . . . Due to her verbal conversation with [Nurse] Cronley, nursing coordinator, it was determined to send her home since it appeared she was physically incapable of working. . . . My question was in regards to why on the 19th she could work one day and then on the 20th she could work full time.

The office person (whose name I did not understand) stated that they had written the excuse on 1/18/00 for 1 day because that is specifically what [Plaintiff] had requested. She went on to say that [Plaintiff] had contacted them upset because she had been "unallowed to work and escorted to her car." She said the

concept that their office attempts to get through to employers is that people need to go on with their lives even after a cancer diagnosis and treatment. I asked her if Dr. Cole felt that [Plaintiff] was physically capable of working full time on the assembly line. She avoided answering by stating that Honda should rehab [Plaintiff] into a position less physically demanding. I explained that [Plaintiff] was a production associate, therefore our only options were to place her in the production environment.

(*Plaintiff's Memorandum Contra,* Ex. S). The statement memorialized by Jackson is in conflict with Dr. Cole's January 21, 2000, return to work report which placed no limitation on Plaintiff.

After Plaintiff was not allowed to return to work on January 21, 2000, she waited approximately (1) week before contacting Tucker. (Pl. Dep (II) at 131). Tucker had previously expressed to Plaintiff that she need not call him regarding her job, rather he would contact her. (*Id.* at 127). During the phone conversation, Tucker told Plaintiff that Defendant was still reviewing her medical records. (*Id.* at 131). On February 1, 2000, Plaintiff was terminated.

Plaintiff claims that Defendant terminated her because of her disability. (*Plaintiff's Memorandum Contra,* at 23–24). Further, Plaintiff claims Defendant's own action caused her to be subject to the 12–month policy and asserts that she was able to work within such time period. (*Id.* at 23).

Defendant claims that it terminated Plaintiff because it honestly believed she was unable to return to work on January 19, 2000 and January 21, 2000, and that Plaintiff could not work for twelve consecutive months, subjecting her to Defendant's 12–month policy. (*Defendant's Memorandum in Support,* at 13; Pl. Dep. (II) at 134–136).

## II.

The procedure for considering whether summary judgment is appropriate is set forth in Federal Rule of Civil Procedure 56(c), which provides:

The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

The evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S. H. Kress & Co.,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Summary judgment will not lie if the dispute about a material fact is genuine; "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment is appropriate however, if the opposing party fails to make a showing sufficient to ˙establish the existence of an element essential to that part's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Matsushita Electronic Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The Sixth Circuit Court of Appeals has recognized that *Liberty Lobby, Celotex,* and *Matsushita* have effected "a decided change in summary judgment practice," ushering in a "new era" in summary judgments. *Street v. J.C. Bradford & Co.* 886 F.2d 1472, 1476 (6th Cir.1989). The court in *Street* identifies a number of important principles in new era summary judgment practice. For example, complex cases and cases involving state of mind issues are not necessarily inappropriate for summary judgment. *Id.* at 1479.

In addition, in responding to a summary judgment motion, the nonmoving party "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" *Id.* (quoting *Liberty Lobby,* 477 U.S. at 257, 106 S.Ct. 2505). The nonmoving party must adduce more than a mere scintilla of evidence in order to overcome the summary judgment motion. *Id.* It is not sufficient for the nonmoving party to merely " 'show that there is some metaphysical doubt as to the material facts.' " *Id.* (quoting *Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348). Moreover, "[t]he trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Id.* That is, the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact.

## III.

Initially, the Court will address (A) Plaintiff's Motion to Strike and (B) Plaintiff's Motion for Leave to File a Surreply. (Doc. # 22; Doc. # 25). Then the Court will turn to (C) Defendant's Motion to for Summary Judgment. (Doc. # 16).

### A. *Plaintiff's Motion to Strike*

Plaintiff requests that the Court strike portions of two affidavits and to strike a third affidavit in its entirety because they do not conform to the requirements of Rule 56(e) of the Federal Rules of Civil Procedure. Rule 56(e) provides that affidavits used in support of or in opposition to a motion for summary judgment "shall be made on personal knowledge, shall set forth such facts as would be admissible in

evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."

■ First, Plaintiff asks the Court to disregard portions of Nurse Cronley's Affidavit because they are not based on personal knowledge and it conflicts with her deposition testimony. (*Plaintiff's Motion to Strike*, at 3). The Court disagrees.

In reviewing Nurse Cronley's Affidavit it is clear that the statements therein were based on personal knowledge, or that her personal knowledge can be inferred from the content of the statements. *See Reddy v. Good Samaritan Hospital and Health Center*, 137 F.Supp.2d 948, 956 (S.D.Ohio 2000). It is also evident to the Court that there is nothing inconsistent between Cronley's Affidavit and her subsequent deposition testimony. In her Affidavit, Cronley testifies concerning the events that took place between herself and Plaintiff on particular dates and the bases of her subsequent decisions about those events. The Court can find no portion of Nurse Cronley's Affidavit that is subject to exclusion on the ground that it was not within her personal knowledge or that it conflicts with her deposition testimony.

■ Second, Plaintiff requests that the Court disregard Paragraph four (4) and five (5) of Chris Tucker's Affidavit because the statements are conclusory allegations and legal conclusions. (*Plaintiff's Motion to Strike*, at 9). In paragraph 4 of his Affidavit, Tucker testified that "the 12–Month Rule does not distinguish between disabled and non-disabled associates in its application, and the 12–Month Rule is consistently and uniformly applied with respect to all [Honda] associates." Plaintiff contends that this statement is conclusory. (*Plaintiff's Motion to Strike*, at 9 citing *Alderdice v. American Health Holding, Inc.*, 118 F.Supp.2d 856 (S.D.Ohio 2000)).

The Court concludes that Tucker has not "speculate[d] generally about unsub-

stantiated facts, and offer[ed] legal conclusions based on these facts" as did the plaintiff in the case to which Plaintiff cites. *Alderdice*, 118 F.Supp.2d at 862. In *Alderdice* the plaintiff did not present any foundation showing that she was in a position to know that to which she was testifying. The plaintiff testified as to how the defendant's employees were classified and the positions and times the employees worked. The court found that although, as an employee of the defendant, the plaintiff may have had a general sense of who worked for the defendant, that fell far short of admissible evidence on who were the defendant's employees under the relevant FMLA standards. In this case, Tucker's position at Honda requires him to be familiar with the 12–month policy because he is directly responsible for application of the policy. (Tucker Dep. at 7–9). Thus, the Court finds that Tuckers statements are admissible as to Defendant's 12–month policy.

■ Paragraph 5 of Tucker's Affidavit states that Plaintiff's termination "for violation [of] the 12–Month Rule resulted from [Honda's] honest belief that she was medically unfit to work for a period in excess of twelve consecutive months." Plaintiff claims this statement is a legal conclusion and that "Defendant would like this Court to believe that Mr. Tucker used the phase [sic] 'honest belief' without any assistance from Defendant or Defendant's Counsel." (*Plaintiff's Motion to Strike*, at 10). The Court disagrees. While the Court is not bound to accept such conclusions, it may consider Tucker's claim on behalf of Honda together with all other relevant facts.

Finally, Plaintiff asks the Court to strike Joseph Berner's Affidavit because it misleads the Court and is irrelevant. Plaintiff claims that Defendant offers Mr. Berner's Affidavit for the purpose of proving that

Plaintiff failed to mitigate her damages. Because of the Court's conclusion, *infra*, that the issue of mitigation is for the jury, the issue is moot. Thus, the Court denies Plaintiff's request.

Based on the foregoing, Plaintiff's Motion to Strike is denied.

### B. Plaintiff's Motion for Leave to File Surreply and Defendant's Motion in Opposition to Surreply

Plaintiff asks the Court for leave to file a Surreply to Defendant's Reply to Plaintiff's Memorandum Contra pursuant to S.D. Ohio Local Rule 7.2(a)(2). Plaintiff contends that the additional information contained in the Surreply will be helpful to the Court in deciding Defendant's Motion for Summary Judgment. (*Motion to File Surreply*, at 1). Plaintiff argues that the Surreply will be helpful "because in its Reply, Defendant made certain allegations and declarations that are either wholly unsubstantiated or easily explained." (Id. at 2).

Local Rule 7.2(a)(2) provides that, after the moving party has filed its Reply Memorandum in response to the non-moving party's Memorandum in Opposition, no additional memoranda will be permitted except upon leave of the Court for good cause shown. Where the non-moving party fails to establish "good cause" for filing a Surreply, a motion for leave to file the Surreply should be denied. *Adams v. Noble*, 137 F.Supp.2d 1054, 1056 (S.D.Ohio 2001). The Court concludes that Plaintiff's proffered reasons to file the Surreply do not constitute good cause. The Court is confident that it can discern the relevance and weight to be given to allegations made by Defendant in its briefs without further explanation from Plaintiff.

In light of the foregoing, Plaintiff's Motion to for Leave to File Surreply is denied and Defendant's Motion in Opposition to Surreply is granted.

### C. Defendants Motion for Summary Judgment

Defendant moves for summary judgment on all Plaintiff's claims.

#### 1. Disability Discrimination and Damages

Initially, the Court will address Defendant's claim that it is entitled to summary judgment on Plaintiff's claims of disability discrimination.[6] Then, the Court will address Defendant's claim that it is entitled to summary judgment on Plaintiff's claims for damages resultant from the alleged discrimination.

##### (a) Disability Discrimination

The ADA makes it unlawful for an employer to discriminate against a qualified individual in the terms and conditions of employment based on that individual's disability. 42 U.S.C. § 12112(a). Disability discrimination can be asserted under a theory of direct evidence of discrimination or a theory of indirect evidence of discrimination. *Monette v. Electronic Data Sys. Corp.*, 90 F.3d 1173 (6th Cir.1996).

In the case *sub judice*, the parties frame their arguments as to what is termed the indirect evidence method of establishing disability discrimination. When a plaintiff seeks to establish his or her case indirectly, the traditional *McDonnell Douglas*[7]

---

6. The Court analyzes Plaintiff's federal and state law discrimination claims simultaneously. With regard to all matters at issue in this case, the analysis of the O.R.C. Chapter 4112 claim mirrors that of the ADA claim. *Plant v. Morton Int'l. Inc.*, 212 F.3d 929 (6th Cir. 2000); *Plumbers & Steamfitters Jt. Apprentice-*

ship Comm. v. Ohio Civil Rights Comm., 66 Ohio St.2d 192, 421 N.E.2d 128 (1981).

7. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

burden shifting approach applies, which is described as follows:

Plaintiff may establish a prima facie case of discrimination by showing that: (1) he or she is disabled; (2) otherwise qualified for the position, with or without reasonable accommodation; (3) suffered an adverse employment decision; (4) the employer knew or had reason to know of the plaintiff's disability; and (5) the position remained open while the employer sought other applicants or the disabled individual was replaced. The defendant must then offer a legitimate explanation for its action. If the defendant satisfies this burden of production, the plaintiff must introduce evidence showing that the proffered explanation is pretextual. Under this scheme, the plaintiff retains the ultimate burden of persuasion at all times.

*Monette*, 90 F.3d at 1186–87.

Defendant does not dispute that Plaintiff has established a *prima facie* case of discrimination. Defendant argues, however, that it had a legitimate nondiscriminatory reason for terminating Plaintiff. Defendant asserts that it terminated Plaintiff because she violated its 12–month policy. Defendant claims that the Sixth Circuit has upheld a policy virtually identical to its 12–month policy as a legitimate non-discriminatory reason for an employee's termination as a matter of law. (*Defendant's Memorandum in Support*, at 16 citing *Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042 (6th Cir.1998)). Further, Defendant contends that Plaintiff cannot prove that its legitimate nondiscriminatory reason for her termination was pretext because it "honestly believed" that she was not physically capable of returning to work.

Defendant claims that the adverse employment action was Plaintiff's termination pursuant to its 12–month policy. Plaintiff argues, however, that Defendant did not

*allow* her to return to work within such 12 month period, even though her physician unconditionally certified her as able to work. If Plaintiff is correct, that she was not ill when she attempted to return to work, the adverse decision was Defendant's denial of her attempted return. If, however, Plaintiff was physically incapable of returning to work before the end of her approved medical leave, as Defendant claims, then the adverse employment action was Plaintiff's termination. Thus, the Court will address both Defendant's denial of Plaintiff's request to return to work and Plaintiff's termination.

▪ Secondarily, the Court clarifies that the parties' reliance on the indirect evidence theory of discrimination under which this case has been argued is misplaced. This case is one in which direct evidence of disability discrimination exists. "In a disability discrimination suit, 'when an employer admits (or the evidence establishes) that its decision was based upon the employee's disability, direct evidence of discrimination exits.'" *Back v. United States Postal Service*, 2000 WL 353543, at *3, 2000 U.S.App. LEXIS 6133, at *7 (6th Cir. March 29, 2000) *citing Monette*, 90 F.3d at 1180. Thus, "if the plaintiff has direct evidence that the employer relied on his or her disability in making an adverse employment decision, or if the employer admits reliance on the handicap," the case should be analyzed under a theory of direct disability discrimination. *Monette*, 90 F.3d at 1186.

The case at bar is properly analyzed under a direct theory of disability discrimination because Defendant does not disclaim reliance on Plaintiff's disability as the basis for its decision to forbid Plaintiff's return to work on January 19, 2000, and January 21, 2000. Defendant's explanation for its decision to disallow Plaintiff's attempted returns to work is that it be-

lieved she was physically unfit to work. (*Defendant's Memorandum in Support*, at 4, 23). The reason Plaintiff was physically unable to work, or Defendant perceived her as physically unable to work, was because of her Lymphoma and/or GvH disease.

Defendant's explanation for its decision to terminate Plaintiff is that she allegedly violated the 12–month policy.[8] This is not a case, however, where Honda terminated an employee who had been off work in excess of one year, made no request to return, or made no attempts to return. Instead, Plaintiff claims here that she was in fact capable of returning to work within a twelve month period but was prevented from doing so by her employer. Defendant contends that it applied the 12–month policy to Plaintiff honestly believing that she was *physically unable to work* for more than twelve consecutive months. (*Defendant's Memorandum in Support*, at 4, 23). The reason Plaintiff was physically unable to work for a period of more than twelve consecutive months, or Defendant perceived that she was unable to work for more than twelve consecutive months, was because of her Lymphoma and/or GvH disease. These reasons are directly related to Plaintiff's disability, even though her termination is couched in terms of violation of company policy.

Defendant's own explanation for its action establishes that it relied on Plaintiff's disabled status to prevent her return to work and her subsequent termination. *Monette*, 90 F.3d at 1187. *Monette* governs the Court's conclusion on this issue. The *Monette* court found that the district court had improperly analyzed the case before it as one of indirect discrimination. The court explained that:

> [W]e believe this approach to be inappropriate on the facts of this case. The defendant's explanation for the decision to replace Monette was that Monette was on medical leave, unable to perform the job under any circumstances, and that, because only one customer service representative was employed in the building, the need to replace Monette was urgent. Viewed properly, all of these reasons are related to Monette's handicap. In other words, the defendant's own explanation for its action established that it relied on Monette's disabled status to replace him.

---

8. Defendant claims that it was required to terminate Plaintiff because of its legitimate nondiscriminatory 12–month policy. Defendant asserts that under *Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042 (6th Cir.1998), its 12–month policy is properly held to be a legitimate nondiscriminatory reason for termination of employees as a matter of law. (*Defendant's Memorandum in Support*, at 15). This assertion is simply incorrect.

*Gantt* involved a wholly different analysis, i.e. a disparate impact analysis, not a disparate treatment analysis. In the case at bar, Plaintiff alleges disparate treatment. A plaintiff may, in the alternative to proof of disparate treatment, prove discrimination by evidence of a differentiated disparate impact resulting from the employer's discriminatory policies which amount to a pattern or practice of discrimination. *See Harper v. BP Exploration & Oil, Inc.*, 1998 WL 45487, at *17,

1998 U.S.App. LEXIS 1324, *32 (6th Cir. 1998) (citations omitted). "In this circuit, a disparate impact claim must be buttressed by statistical proof of a pervasive corporate pattern and practice of discrimination: 'Unlike disparate treatment, disparate impact does not require a showing of discriminatory motive, since the claim is based on statistical evidence of systematic discrimination (i.e., a pattern or practice which results in discrimination).'" *Id.* citing *Huguley v. General Motors Corp.*, 52 F.3d 1364, 1370 (6th Cir.1995) (citations omitted). Although, the Sixth Circuit has said that evidence of disparate impact may be admissible as probative of pretext, *Simpson v. Midland–Ross Corp.*, 823 F.2d 937, 943 (6th Cir.1987), *Gantt's* holding as to 12–month absence policies in a disparate treatment case beyond that issue is of no relevance to this case.

*Monette*, 90 F.3d at 1187. The court elaborated on properly differentiating between direct and indirect discrimination cases in a hypothetical situation in which it explained:

> Consider, for example, a situation in which Monette had suffered a somewhat less egregious injury, and he was permanently limited to working four hours per day. Suppose he worked four hours per day for one month, at the end of which the defendants terminated him and replaced him with a new employee. Suppose also that the defendant justifies its decision on the ground that a full-time customer service representative was needed, and Monette was only showing up to work half days, an unacceptable situation for the defendant. *This justification would not be unrelated to Monette's disability. Rather, Monette's disability (which rendered him unable to work full time) is the reason he is replaced,* although the defendant has couched its explanation in terms of Monette's job performance. Properly analyzed, the dispositive issue in this hypothetical case is whether Monette is "otherwise qualified" despite his disability with a reasonable accommodation from the employer (for example, the defendant might hire another part time employee to work the afternoon shift).

*Monette*, 90 F.3d at 1187 n. 14. Similarly, in the instant case Defendant justifies its decision to terminate Plaintiff on the ground that Plaintiff violated the 12–month policy. This justification is not unrelated to Plaintiff's disability. Rather, Plaintiff's disability, which Defendant believed rendered her unable to work for greater than 12 consecutive months is the reason she was terminated.

■ Thus, the Court will analyze this case under a theory of direct discrimination. Under *Monette*, if the plaintiff has direct evidence that the employer relied on his or her disability in making an adverse employment decision, or if the employer admits reliance on the disability:

> 1) The plaintiff bears the burden of establishing that he or she is "disabled."
>
> 2) The plaintiff bears the burden of establishing that he or she is "otherwise qualified" for the position despite his or her disability; a) without accommodation from the employer; b) with an alleged "essential" job requirement eliminated; or c) with a proposed reasonable accommodation.
>
> 3) The employer will bear the burden of proving that a challenged job criterion is essential, and therefore a business necessity, or that a proposed accommodation will impose an undue hardship upon the employer.

*Monette*, 90 F.3d at 1186.

The first issue under *Monette* is undisputed. The ADA defines "disability" with respect to an individual as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment, or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2)(A–C). Plaintiff claims that she satisfies subsections (B) and (C) of this definition. Defendant does not dispute this assertion.

■ The primary issue in this case is the second prong of the *Monette* analysis, that being whether Plaintiff is "otherwise qualified" for the position to which she sought to return. As to this issue, Plaintiff must prove that she is otherwise qualified for the position of Production Associate despite her disability: a) without accommodation from the Defendant; b) with the alleged essential job requirement eliminated; or c) with a proposed reasonable accommodation. *Monette*, 90 F.3d at 1186.

First, Plaintiff claims that she was otherwise qualified to return to her job at Honda without accommodation. Plaintiff claims that when she attempted to return to work on January 21, 2000, she could in fact function capably as a Production Associate as that position existed. Plaintiff claims that she was released by her doctor, without restriction, to return to work on this date. (*Plaintiff's Memorandum Contra*, at 29). Plaintiff asserts that this unconditional release made it clear that her previous request for a four month extension and her previous request to return to work for one day were no longer issues. (*Id.*).

Defendant counters with the argument that "Plaintiff had been diagnosed with breast cancer and lymphoma, had undergone a bone marrow transplant, and had already missed nearly twelve consecutive months of work as a result of her very serious medical conditions, when she appeared in Honda's Medical Department on January 19 and 21, 2000[.]" (*Defendant's Memorandum in Support*, at 23). The attempts by Plaintiff to return to work were afflicted by inconsistent and incomplete medical documentation, alarming statements by Plaintiff herself, a bizarre request to return to work "for one day only." (*Defendant's Reply Memorandum to Plaintiff's Memorandum Contra*, at 9). Specifically, Defendant claims that it was never informed that Plaintiff's condition had changed since her release to return to work for one day only. (*Id.* at 24). Plaintiff's full medical release dated January 20, 2000, contained no diagnosis, leaving unclear whether the release related to her GvH disease, which had prompted her request for a four month leave extension, or her underlying Lymphoma. (*Id.*). Further, the timing of Plaintiff's return from leave (i.e., a day or two before the twelve month period was to elapse), . . ., raised a question in Nurse Cronley's mind as to whether Plaintiff was truly able to return

to work, or whether she was instead attempting to return to work (despite not being medically fit to return) for the sole purpose of avoiding application of the 12–Month Rule." (*Id.* at 25).

Defendant, also asserts that Nurse Cronley was unable to interpret Plaintiff's blood test results that she submitted on January 21, 2000, and the nurse "had no idea (without further explanation) whether they were relevant to Plaintiff's fitness to return to work." (*Id.* at 26). Additionally, Defendant claims that neither Plaintiff nor Dr. Cole ever provided Honda "with any detailed, narrative medical documentation describing Plaintiff's condition and explaining *why* Dr. Cole felt she was medially fit to return to work." (*Id.*) (emphasis in original). Finally, Defendant asserts that circumstances outside the four corners of the submitted medical documentation, such as Plaintiff's comments to a supervisor, reasonably convinced Honda that Plaintiff's health would be endangered if she returned to work. (*Defendant's Reply Memorandum to Plaintiff's Memorandum Contra*, at 5).

The fact remains, however, that Dr. Cole authorized Plaintiff's return to work within the twelve month period, and Honda had such report during the relevant time period. It is also undisputed that blood work performed on January 20, 2000, showed a marked improvement in Plaintiff's condition, causing Dr. Cole to issue the return to work certificate.

At no point prior to discharge did Honda have Plaintiff's medical condition reviewed by a physician. From the facts before the Court, a Board Certified Oncologist, who had treated Plaintiff for over a year, relied on very recent blood work to conclude Plaintiff could return to work. Defendant claims it acted in an "honest belief" that Plaintiff was physically incapable of working at her former position. This belief was

based exclusively on a review by a licenced practical nurse and a phone call to a non-physician employee of Dr. Cole, which Dr. Cole disputes.

Honda would have been well within reason to request an independent medical evaluation, which it did not. Even though the exam would most likely have occurred after the lapse of the 12 month leave, Honda could have determined thereafter, from the independent exam, whether Plaintiff could have returned to work during the 12 month period. Instead, a reasonable jury could conclude that Honda chose to ignore Dr. Coles' return to work authorization and instead relied on a prohibited stereotype that someone who had been as sick as Plaintiff once was could not perform the relevant work.

Based on the foregoing, the Court concludes that there are genuine issues of material fact as to whether Plaintiff was "otherwise qualified" to return to work without accommodation before her approved medical leave had expired. Thus, this issue is inappropriate for disposition as a matter of law and Defendant's Motion for Summary Judgment on this issue is denied.

Second, if the finder of fact concludes that Plaintiff could not return to work before the end of her approved medical leave, then the issue arises whether she could return to work with a proposed accommodation. The ADA makes it clear that failure to accommodate an individual's disability may qualify as discrimination, defining the term "discriminate" to include:

> [N]ot making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hard-

ship on the operation of the business of such covered entity . . . .

*Walsh v. United Parcel Service,* 201 F.3d 718, 724 (6th Cir.2000) *citing* 42 U.S.C. § 12112(b)(5)(A).

The applicable Equal Employment Opportunity Commission ("EEOC") regulations provide that it is "unlawful for a covered entity not to make reasonable accommodation to the known physical or mental limitations of an otherwise qualified applicant or employee with a disability, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of its business." 29 C.F.R. § 1630.9(a). The EEOC's interpretive guidelines indicate that generally "it is the responsibility of the individual with a disability to inform the employer that an accommodation is needed." 29 C.F.R. pt. 1630 App. § 1630.9. "Once a qualified individual with a disability has requested provision of a reasonable accommodation, the employer must make a reasonable effort to determine the appropriate accommodation." *Id.* The EEOC has placed the initial burden of requesting an accommodation on the employee. *Monette,* 90 F.3d at 1183.

The Court must determine whether Plaintiff requested an accommodation. In *Gantt v. Wilson Sporting Goods Co.,* 143 F.3d 1042 (6th Cir.1998) the Sixth Circuit, while examining whether an extension of a 12–month leave policy virtually identical to Honda's policy was a reasonable accommodation, concluded that the plaintiff had not requested an accommodation. The court reasoned that:

> During her leave of absence Plaintiff *never made a request to return to work* and never requested any kind of accommodation from the Company. Plaintiff complains that the Company failed to warn her before it applied a posted personnel policy, but she *never*

*contacted the Company after she received notice of her termination to request reconsideration* in light of her misunderstanding of the leave policy. Even after she received her doctor's release she did not contact the Company to discuss accommodation for her disability.

The last thing the Company heard from Plaintiff was that she did not know when she would be able to return to work. Reasonable accommodation does not require the employer to wait indefinitely for an employee's medical condition to be corrected.

*Gantt,* 143 F.3d at 1047 (internal citations omitted) (emphasis added). The court asserted that the employer was not required to speculate as to the extent of the employee's disability or the employee's need or desire for an accommodation. *Id.* at 1046–47.

In the case at bar, unlike *Gantt,* Defendant was not required to speculate as to Plaintiff's desire for accommodation. Plaintiff made it quite clear to Defendant that she did not want to lose her job. On two occasions Plaintiff attempted to return to work. She called several times to discuss her concerns about termination pursuant to the 12–month policy. Throughout January of 2000, Plaintiff continually requested that she be allowed to keep her job and that she not be terminated. After her termination she sought reconsideration of Honda's decision. Consequently, although Plaintiff did not expressly articulate that she proposed an accommodation of an extension of her medical leave, that request was implicit in her requests that she not be fired pursuant to the 12–month policy.

■ The ADA does not require that any talismanic language be used in a request for reasonable accommodation. *Taylor v. Phoenixville School Dist.,* 184 F.3d 296, 313 (3rd Cir.1999) (stating that the EEOC manual makes clear that the employee need not invoke any specific words; rather, the employer need only know of both the disability and the employee's desire for accommodations for that disability); *see also Thompson v. E.I Dupont deNemours & Co.,* 140 F.Supp.2d 764, 774 n. 8 (E.D.Mich.2001) (finding not a single Sixth Circuit case in which an employee's "vague" request wholly excused the employer from any further inquiry regarding a possible accommodation). "What matters under the ADA are not formalisms about the manner of the request, but whether the employee ... provides the employer with enough information that, under the circumstances, the employer can be fairly said to know of both the disability and desire for an accommodation." *Taylor,* 184 F.3d at 313; *see also Bultemeyer v. Fort Wayne Community Schools,* 100 F.3d 1281, 1285 (7th Cir.1996) (citation omitted) (holding that "[a]n employee's request for reasonable accommodation requires a great deal of communication between the employee and the employer ....."). Thus, although Plaintiff did not explicitly request additional medical leave, Honda was provided enough information that it was required to engage in the interactive process with regard to further accommodating Plaintiff.

■ Because Defendant was aware of Plaintiff's desire for accommodation, it was required to "make a reasonable effort to determine the appropriate accommodation." 29 C.F.R. pt. 1630 App. § 1630.9. "The appropriate reasonable accommodation is best determined through a flexible interactive process that involves both the employer and the [employee] with a disability" *Id.* Further, when an employee requests a reasonable accommodation, an employer is required to individually address the requested accommodation. *Cehrs v. Northeast Ohio Alzheimer's Re-*

search Center, 155 F.3d 775, 782 (6th Cir. 1998) citing School Bd. of Nassau County v. Arline, 480 U.S. 273, 287, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987) (finding that an individualized inquiry by the employer helps to achieve the ADA's goal of protecting individuals with disabilities from deprivations based on prejudice, stereotypes, or unfounded fear, while simultaneously protecting the employer from incurring unreasonable expenses or shouldering undue burdens).

■ It is Plaintiff's burden to establish that an extension of her medical leave would be an objectively reasonable accommodation. Monette, 90 F.3d at 1183, 1184 n. 10 and 1187. The inquiry into reasonableness requires "a factual determination untethered to the defendant employer's particular situation." Id. at 1184 n. 10. The Sixth Circuit has held that "a medical leave of absence can constitute a reasonable accommodation under appropriate circumstances." Cehrs, 155 F.3d at 783. The court explained that "[i]t is not clear why unpaid leave should be analyzed differently from any other proposed accommodation under the ADA." Id. at 782 citing Norris v. Allied–Sysco Food Services, Inc., 948 F.Supp. 1418 (N.D.Cal.1996).

Thus, the issue in the instant case is whether an additional medical leave, beyond the 12 month leave, is objectively reasonable. The Sixth Circuit has held an **indefinite leave** of absence is not an objectively reasonable accommodation. Monette, 90 F.3d at 1187 (emphasis added). The Sixth Circuit has also held that when an employer has already provided a substantial leave, an additional leave period of a significant duration, **with no clear prospects for recovery,** is an objectively unreasonable accommodation. Walsh, 201 F.3d at 727 (emphasis added) (the employee was given one year paid disability leave, an additional six month of unpaid leave to provide the employer with information

concerning his alleged disability, yet the employee did not provide the information and made no showing that the delay was attributable to his disability).

In the instant case, Honda agreed to a 12 month leave, eliminating any question as to whether this precise period of time was reasonable. Further, Plaintiff's "condition," while requiring a lengthy period of absence, did not render her "with no clear prospects for recovery." If a jury first finds that Plaintiff violated the 12–month policy, it must then consider whether Plaintiff requested and was denied a reasonable accommodation in the form of additional leave. Therefore, there are issues of material fact as to whether an extension of medical leave for any amount of time past the 12–months would be objectively reasonable.

■ If Plaintiff proves that an exception to the 12–month policy is an objectively reasonable accommodation, the burden shifts to Defendant to show that providing the additional leave would impose an undue hardship. Monette, 90 F.3d at 1183, 1184 n. 10 and 1187. Whether a reasonable accommodation imposes an undue burden is evaluated with regard to "the employer's specific situation." Id. at 1184 n. 10. "If an employer cannot show that an accommodation unduly burdens it, then there is no reason to deny the employee the accommodation." Cehrs, 155 F.3d at 782. It is unclear whether Honda would be unduly burdened by granting Plaintiff an extension of her medical leave. This is because Honda did not individually assess Plaintiff's request that she not be fired pursuant to the 12–month leave policy.

The Court concludes that genuine issues of material fact exist such to make summary judgment inappropriate on the issue of whether Plaintiff was "otherwise qualified" to perform her job.

### (b) Damages

A plaintiff seeking damages in an employment discrimination case is required to use reasonable diligence to obtain substantially equivalent employment after termination. *Ford Motor Co. v. EEOC*, 458 U.S. 219, 231–32, 102 S.Ct. 3057, 73 L.Ed.2d 721 (1982). The employer carries the burden to show there exist substantially equivalent positions with virtually identical promotional opportunities, compensation, job responsibilities, working conditions, and status. *Rasimas v. Michigan Dept. of Mental Health*, 714 F.2d 614, 624 (6th Cir.1983), *cert. denied*, 466 U.S. 950, 104 S.Ct. 2151, 80 L.Ed.2d 537 (1984). A plaintiff's diligence must be evaluated in light of the "individual characteristics of the claimant and the job market." *Id.* "An employee is not required to go to heroic lengths to mitigate his damages, but only to take reasonable steps to do so." *Ford v. Nicks*, 866 F.2d 865, 873 (6th Cir.1989) (citations omitted).

Defendant argues that it is entitled to summary judgment on the issue of mitigation because Plaintiff has failed to use reasonable care and diligence in seeking new, substantially equivalent employment after her termination to help mitigate her damages. (*Defendant's Memorandum in Support*, at 30). Plaintiff asserts that she applied to Cooper Tire & Rubber Company in Findlay, Ohio. (Pl.Dep.(II) at 175–177). She also spoke with people informally about job opportunities and she scours the local newspapers every day. (*Id.*). Plaintiff asserts that the county in which she lives, Hardin County, is lacking in well paying employment opportunities. (*Id.* at 177). Further, most companies require a medical evaluation conditional to an offer of employment, and Plaintiff's medical history is complex. (*Plaintiff's Memorandum Contra*, at 38). The Court concludes that there are genuine issues of material fact as to the "reasonableness" of Plaintiff's efforts to secure a substantially equivalent job. *See Dawson v. Qube Corp.*, 6 F.Supp.2d 677, 684–85 (N.D.Ohio 1998) (concluding same).

Defendant also argues that it is entitled to summary judgment on Plaintiff's claim for damages consisting of the income tax and early withdrawal penalty paid by Plaintiff after she liquidated her 401K plan with Defendant. (*Defendant's Memorandum in Support*, at 33). Defendant claims that because Plaintiff voluntarily liquidated her 401K, Defendant cannot possibly be a direct and proximate cause of Plaintiff's damage. Plaintiff claims that after losing her job of ten (10) years and residing in a financially depressed area of Ohio combined to leave her no choice but to liquidate her 401K. Plaintiff asserts that this was a reasonable action flowing from her wrongful termination. The Court, however, again concludes that this is an issue of fact and, is properly decided by the jury.

Consequently, the Court denies Defendant's Motion for Summary Judgment on the issue of damages.

### 2. Wrongful Discharge in Violation of Public Policy

Ohio law limits the employment-at-will doctrine by creating a common law tort claim for wrongful discharge in violation of public policy. *Greeley v. Miami Valley Maintenance Contractors, Inc.*, 49 Ohio St.3d 228, 551 N.E.2d 981 (Ohio 1990). The elements of a claim for wrongful discharge in violation of public policy are: 1) Existence of a clear public policy; 2) Dismissing the employee under circumstances jeopardizing the public policy; 3) Dismissal motivated by conduct related to the public policy; and 4) Lack of employer's overriding legitimate business justification. *Painter v. Graley*, 70 Ohio

St.3d 377, 384 n. 8, 639 N.E.2d 51 (1994). The clarity and jeopardy elements, both of which involve relatively pure law and policy questions, are questions of law to be determined by the court. *Collins v. Rizkana,* 73 Ohio St.3d 65, 70, 652 N.E.2d 653 (1995). The jury decides factual issues relating to causation and overriding justification. *Id.*

### (a) The Clarity Element

Plaintiff alleges that the source of public policy upon which her *Greeley* claim is based is found in O.R.C. Chapter 4112. Section 4112.02 provides in pertinent part,

It shall be an unlawful discriminatory practice:

(A) For any employer, because of the ... disability ... of any person, to discharge [that person] without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment.

The civil remedies for violation of Chapter 4112 are set forth in O.R.C. § 4112.99, which provides in pertinent part, that "whoever violates this chapter is subject to a civil action for damages, injunctive relief, or any other appropriate relief." O.R.C. § 4112.02 and § 4112.99 demonstrate that a clear public policy exists under Ohio law prohibiting discrimination based on disability. Since a clear public policy exists, the clarity element for the cause of action for tortious wrongful discharge in violation of public policy is satisfied.

### (b) The Jeopardy Element

Having identified a clear public policy, the Court must now consider whether dismissing employees under circumstances such as those involved in Plaintiff's dismissal would jeopardize the public policy identified above. Clearly, the dismissal of an employee based on disability would jeopardize the clear policy in the state of Ohio prohibiting such actions.

■■■ Defendant, however, argues that under Ohio law, a plaintiff is entitled to pursue a claim for violation of public policies embodied in a statute only where the statute does not itself provide adequate civil remedies. (*Defendant's Memorandum in Support,* at 40). Defendant asserts that Plaintiff cannot maintain an action for wrongful discharge in violation of public policy based solely on the policies embodied in O.R.C. § 4112.02 and/or § 4112.99, since those statutes already provide adequate civil remedies. (*Id.*). In other words, Defendant maintains that an employee who is discharged in violation of O.R.C. § 4112.02 may not bring both a statutory claim and a common-law cause of action in tort. Defendant is mistaken.

The Ohio Supreme Court recently addressed this issue in *Kulch v. Structural Fibers,* 78 Ohio St.3d 134, 150–51, 677 N.E.2d 308 (1997). In *Kulch,* the employee brought a statutory cause of action against his employer pursuant to the Ohio Whistleblower Statute, O.R.C. § 4113.52, as well as a breach of public policy claim pursuant to *Greeley. Id.* at 136–37, 677 N.E.2d 308. In analyzing the jeopardy element relating to the Whistleblower Statute source of public policy, the *Kulch* court stated that "the *Greeley* public-policy exception to the doctrine of employment at will was not intended to apply only where a statute provides no civil remedies." *Id.* The *Kulch* court further stated that "the mere existence of statutory remedies in R.C. 4113.52 [the Whistleblower Statute] does not, without more, operate to bar recognition of appellant's *Greeley* claim for tortious wrongful discharge in violation of R.C. 4113.52." *Id.* at 156, 677 N.E.2d 308. *Kulch* held that an at-will employee who is discharged in violation of the Whistleblower Statute may maintain a statutory claim

for the violation, a common-law cause of action in tort, or both, but the employee is not entitled to double recovery. *Id.* at 162, 677 N.E.2d 308.

Although *Kulch* only specifically concerned the Whistleblower Statute, it was recently applied in the Ohio Supreme Court's decision in *Livingston v. Hillside Rehabilitation Hospital,* 79 Ohio St.3d 249, 680 N.E.2d 1220 (1997), in which the employee brought a statutory cause of action for age discrimination under O.R.C. § 4112.02, and a *Greeley* claim based solely on the violation of § 4112.02. There, the employee only identified one source of public policy, O.R.C. Chapter 4112. *Livingston,* 1997 WL 51413, at *1, 1997 Ohio App. LEXIS 244, No. 95–T–5360, at *1 (Ohio Ct.App. Jan 24, 1997). The trial court concluded, and the appellate court affirmed, that the employee was barred from pursuing her public policy tort claim in conjunction with her statutory claim, which already provided her with relief. *Id.* 1997 WL at *2. The Ohio Supreme Court reversed and remanded the case on the authority of *Kulch.* *Livingston,* 79 Ohio St.3d at 249, 680 N.E.2d 1220. By its reversal, the Ohio Supreme Court indicated its intent to apply the *Kulch* holding to a claim of age discrimination under O.R.C. § 4112.02, the same statute at issue here.

In recent decisions involving wrongful termination claims, this Court has found that Ohio law recognizes a public policy claim for wrongful termination based on discrimination in violation of O.R.C. Chapter 4112. *See Schoenberger v. The Andrew Jergens Co.,* No C–1–97–781 (S.D.Ohio Sept. 15, 1998) (Dlott, J.) (allowing a plaintiff to maintain both statutory and public policy claims in an age and gender discrimination lawsuit); *Smith v. Glaxo Wellcome, Inc.,* 1998 U.S. Dist. LEXIS 22455, No. C–1–96–540 (S.D. Ohio June 11, 1998) (Dlott, J.) (recognizing a public policy claim for wrongful discharge

based on age and gender discrimination); *Rogers v. AK Steel Corp.,* 1998 WL 1753590, 1998 U.S. Dist. LEXIS 22450, No. C–1–96–987 (S.D.Ohio Apr. 16, 1998) (Beckwith, J.) (allowing a plaintiff to amend his complaint to include a public policy tort claim based on age discrimination); *Schutte v. United Dairy Farmers, Inc.,* 1998 U.S. Dist. LEXIS 22449, No. C–1–97–850 (S.D.Ohio Mar. 17, 1998) (Spiegel, J.) (holding that a plaintiff asserting age discrimination could simultaneously seek statutory and public policy tort remedies).

Based on Ohio law, as well as this Court's consistent interpretation of Ohio law, the Court concludes that Ohio recognizes a public policy claim for wrongful termination based on discrimination in violation of O.R.C. § 4112.02. Thus, the jeopardy element in Plaintiff's *Greeley* claim is met.

In sum, the Court concludes that the clarity and jeopardy elements in this cause of action have been established. The factual issues relating to causation and overriding justification remain for determination by the jury. Accordingly, the Court denies Defendant's Motion for Summary Judgment on Plaintiff's wrongful termination claim.

### 3. Intentional Infliction of Emotional Distress

 The Supreme Court of Ohio recognizes the tort of intentional infliction of emotional distress. *Yeager v. Local Union 20,* 6 Ohio St.3d 369, 453 N.E.2d 666 (1983). A defendant's conduct must be "extreme and outrageous" in order to assert an intentional infliction of emotional distress cause of action. It is for the Court in the first instance to determine whether Defendant's conduct may be regarded as so extreme and outrageous as to permit recovery. *Crawford v. ITT Con-*

*sumer Financial Corp.,* 653 F.Supp. 1184, 1192 (S.D.Ohio 1986) *citing* Restatement (Second) of Torts § 46 cmt. h. Both the Ohio Supreme Court in *Yeager* and the Sixth Circuit in *Polk v. Yellow Freight System,* 801 F.2d 190 (1986), have adopted the standard set forth in comment d to Section 46 of the Second Restatement of Torts for determining whether the "extreme and outrageous" requirement has been met:

> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'
>
> The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. The rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind. There is no occasion for the law to intervene in every case where someone's feelings are hurt. There must still be freedom to express an inflattering opinion, and some safety valve must be left through which irascible tempers may blow off relatively harmless steam.

*Id. citing* Restatement (Second) of Torts, § 46, cmt. d.

██ Plaintiff claims that she suffered severe distress which required her to be treated with a medication for depression. (*Plaintiff's Memorandum Contra,* at 48). Plaintiff's doctor confirmed that the depression was due to the "employment issues." (Cole Dep. at 56). Further, the doctor "mentioned legal and financial issues, which are a direct result of Plaintiff's unlawful termination." (*Plaintiff's Memorandum Contra,* at 48).

Looking at the evidence regarding Defendant's conduct in the light most favorable to Plaintiff, the Court cannot find that Defendant's conduct rises to the level of being so extreme and outrageous so as "to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." Defendant did grant Plaintiff extended leave of absence and otherwise accommodated her prior to her discharge. Here, the issue is not whether the discharge was or was not unlawful. The issue is whether there is a genuine issue of material fact that Defendant acted in an outrageous manner. The Court finds that there is not.

The Court finds no genuine issue of material fact as to Plaintiff's intentional infliction of emotional distress claim. Accordingly, Defendant's motion for summary judgment on this claim is granted.

**IV.**

Based on the foregoing, the Court: **DENIES** Plaintiff's Motion to Strike and Plaintiff's Motion to File a Surreply (Doc. # 22; Doc. # 25); **GRANTS** Defendant's Motion in Opposition to Surreply (Doc. # 27); **DENIES** Defendant's Motion for Summary Judgment on Plaintiff's statutory discrimination claims, including Plaintiff's damages claims, and Plaintiff's

wrongful termination in violation of Ohio public policy claim; and, **GRANTS** summary judgment to Defendant on the Plaintiff's intentional infliction of emotional distress claim. (Doc. # 16).

**IT IS SO ORDERED.**